521 S.E.2d 331

**Natalie HAYNES, Plaintiff below, Appellee,**

v.

**RHONE–POULENC, INC., a foreign corporation, Defendant below, Appellant.**

**No. 25366.**

Supreme Court of Appeals of West Virginia.

Submitted Feb. 17, 1999.

Decided July 14, 1999.

Dissenting Opinion of Justice Maynard July 16, 1999.

Concurring and Dissenting Opinion of Justice Workman July 16, 1999.

P. Rodney Jackson, Esq., Lonnie C. Simmons, Esq., Charleston, West Virginia, Attorney for Appellee.

William E. Robinson, Esq., Joseph M. Price, Esq., Robinson & McElwee, Charleston, West Virginia, Attorneys for Appellant.

STARCHER, Chief Justice:

In the instant case, we affirm an order of the Circuit Court of Kanawha County that awarded back pay, damages for emotional distress, punitive damages, and attorney fees to Ms. Natalie Haynes, for her disability discrimination claim under West Virginia's Human Rights Act. We hold (1) that a person who is temporarily unable to work is protected by the provisions of our Human Rights Act that prohibit discrimination against persons with disabilities in connection with their employment; (2) that a leave of absence may be a required reasonable accommodation for such a person; and (3) that a jury has the right to award punitive damages under the Human Rights Act.

## I.

### Facts and Background

#### A.

##### Factual Summary

Natalie Haynes, the plaintiff below and the appellee in the instant appeal, began working as a chemical laboratory technician in 1981 for Rhone–Poulenc, Inc., the defendant below and appellant. The plaintiff married in 1991, and she became pregnant in April of 1996. Prior to her pregnancy, Ms. Haynes had suffered for some time from migraines and hypertension, and she took medication for these conditions.

In June of 1996, the plaintiff learned that she was pregnant, and so notified the defendant. At her doctor's suggestion she requested a temporary work assignment change, so as to avoid contact with chemicals and reduce her hours from 12 per day to 8 per day, during her pregnancy. The defendant agreed to the change.

Soon thereafter, the plaintiff's doctor advised the plaintiff that due to her hypertension, the plaintiff's pregnancy was high-risk—for her and for her unborn child—and that the plaintiff should not continue to work at all during the remainder of her pregnancy.

In late June or early July of 1996, the plaintiff requested and was allowed to take leave from work, under a paid medical leave program that was generally available to the defendant's employees.[1] The defendant understood that the plaintiff's request for medical leave was occasioned by the defendant's high-risk pregnancy. In connection with the plaintiff's request for disability benefits while she was off on leave, the plaintiff's doctor submitted a form to the defendant stating that the plaintiff's anticipated return to work date was "3/1/97??" The plaintiff explained at trial that the March date reflected about a 2–month wait after her intended due date— but that the due date was uncertain, in part because her medical condition might lead to an early birth.

The plaintiff was an experienced, well-paid, skilled employee, who had consistently good work performance ratings. Her job was a desirable one. She had 15 years' seniority. There was no evidence that the plaintiff had ever suggested that she did not intend to return to work for the defendant following her pregnancy.[2]

The defendant's medical leave policy as set forth in the defendant's written personnel policies entitled the plaintiff, as an employee of many years' longevity, to "short-term dis-

---

**1.** One of the plaintiff's co-workers testified at the trial that she had been off work on leave for about 6 months for each of her three pregnancies.

**2.** At trial, the evidence was that the plaintiff and her husband had relied, in making their family plans, upon the plaintiff's continued employment with the defendant after their child was born. The plaintiff's husband changed his employment to self-employed, home-based computer programming consultant work, with no medical benefits, to allow him to be home more for child care purposes after the plaintiff was able to return to work.

ability" medical leave for up to 6 months—at full salary and benefits. Thereafter, the plaintiff was eligible for continued "long-term disability" medical leave, but at a reduced salary. The written policy also stated that "when possible" an employee's job would be kept open for them while on short-term disability benefits; but that after an employee was on long-term disability status, "business conditions may demand that the position be filled." [3]

The plaintiff was not advised, when she began her leave, of this "we may fill your position after six months if business conditions demand it" provision in the defendant's medical leave policy. The defendant's counsel conceded at trial that the first time the plaintiff learned of this provision was in mid-December of 1996, shortly before her child was born. The defendant offered no evidence as to when, if ever, the defendant had filled a position of a disabled person at the expiration of the person's 6–month short-term disability benefit period.

After the plaintiff began her medical leave, the defendant filled her position with a temporary worker, a Mr. Fuller. He proved to be a good employee, and in November or December of 1996, Dr. Jaleh Abedi, a senior chemist in the laboratory where the plaintiff worked and a supervisor of the plaintiff, asked the human resources division to hire Mr. Fuller as a permanent employee. Dr. Abedi was told that this was not possible, because the plaintiff was on medical leave and her job was being kept open for her.

Dr. Abedi was a key player in the circumstances that led to the defendant's ultimate

---

**3.** The policy stated, in pertinent part:

MEDICAL LEAVE OF ABSENCE

SCOPE

This policy applies to all active full-time or eligible part-time salaried employees of the Company not covered under a separate agreement.

OBJECTIVE

It is Rhone–Poulenc Inc.'s policy to provide adequate income and job security during reasonable leaves of absence resulting from illness or injury.

PROCEDURE

Medical absences in excess of 10 consecutive working days require a physician's statement declaring the nature of the illness and the expected length of time needed for recovery.

1. Compensation and Benefits Continuation

Short-term disability income is determined by the employee's length of service.

Employees with more than two years of service will receive 100% of pay while on disability for up to six months. Those with less than two years of service will receive 100% of pay while on disability for up to ten weeks.

After six months of absence, long-term disability provides 60% of pay from all sources, while the employee continues to be totally disabled, as defined by the provisions of the Long–Term Disability Plan.

The merit review will e delayed by one month for each 30 day period of absence of any kind—(i.e. a 1–29 day absence = no delay, a 30–59 day absence = 1 month delay, a 60–89 day absence = 2 months delay, etc.).

B. Benefits

Employees will remain fully covered under all of the Company's insurance, pension and savings plans during the first six months of absence. After six months, full medical, dental and life insurance benefits will continue while the employee is disabled, or until he/she retires. Pension benefits continue and are based on the employee's full salary while active.

The employee is not eligible to participate in the savings plan while on long-term disability. Employees on long-term disability, however, automatically become vested in the savings plan.

II. Periods of Successive Disability

An employee may be absent from work on two or more occasions as a result of the same or a related disability. If these are separated by thirty or less days of active employment, they will be considered as having occurred during one period of disability.

III. Return to Work

If the employee is disabled for less than 6 months, when possible, the job will be held open and protected until he/she returns. If the employee is disabled for more than 6 months, business conditions may demand that the position be filled. In this case, every reasonable effort will be made to reinstate the employee in a comparable position when he/she is able to return.

Should reinstatement not be feasible when the employee is eligible to return, he/she would be released and would be entitled to full severance as outlined in the Termination Policy. If the employee is rehired, severance payments will cease.

IV. Administration

Employees who are absent for more than 10 consecutive working days are required to complete insurance documentation forms. It is the responsibility of the employee to request the forms from their local Human Resource Representative and to promptly return the completed forms.

The employee's manager is responsible for notifying Human Resources of the employee's date of leave and date of return.

decision, on January 9, 1997, not to keep the plaintiff's position open for her any longer.

The evidence at trial—viewed in the light most favorable to the plaintiff (who prevailed before the jury and is thus entitled to have the evidence so viewed) tended to show that Dr. Abedi was unsympathetic and hostile to the plaintiff. Specifically, the evidence tended to show that Dr. Abedi was intolerant and disdainful of the plaintiff's medical conditions, of the plaintiff's requests for accommodation due to those conditions, and of the plaintiff's decision to take an extended medical leave in connection with her pregnancy.[4]

In November of 1996, the defendant sent the plaintiff a letter advising her that her short-term disability benefits would expire in January, and enclosing forms for her to fill out and return—to continue her insurance coverage and receive reduced salary payments.

The plaintiff and her doctor filled out the forms and returned them to the defendant. The form that the plaintiff completed indicated that she would return to work on "3–21–97;" her doctor gave an anticipated return date of "3/20/96" (*sic*—the "1996" was an error by the doctor in writing the year). The plaintiff also indicated a return date of "at least 3–21–97" on a credit disability insurance form that she sent to the defendant in November of 1996.[5]

On December 12, 1996, the defendant sent the plaintiff a letter acknowledging the receipt of the plaintiff's long-term disability paperwork. This letter for the first time advised the plaintiff of the provision in the medical leave policy wherein the defendant reserved the right to fill the plaintiff's position after her 6 months of short-term disability benefits expired.

The plaintiff received this letter in mid-December, on the very day that she was having a baby shower. The next morning she had a doctor's appointment. Because her blood pressure was fluctuating, she was sent to the hospital's triage monitoring unit for a battery of tests. She thereafter attended that unit for several days for monitoring, until a decision was made that her child must be delivered. On Christmas Eve, 1996, the plaintiff's child was born by Caesarean section.

**4.** The plaintiff testified when the plaintiff tried to talk about her migraines, Dr. Abedi told the plaintiff that she didn't need any kind of medication, she just needed a cold rag on her head. Later, Dr. Abedi reportedly told another technician that Dr. Abedi couldn't believe that the plaintiff was going to a doctor so early in her pregnancy. According to the plaintiff, Dr. Abedi told the plaintiff that she had better do an especially good job (at the work the plaintiff was assigned when she became pregnant and before she took leave), because the defendant was "looking to get rid of people."

Dr. Abedi testified at trial that the plaintiff's descriptions of Dr. Abedi's behavior and attitude toward the plaintiff's medical condition were entirely fictitious. The conflict in the evidence was for the jury, of course. However, on cross-examination, Dr. Abedi seemed to confirm the plaintiff's testimony about the attitude toward the plaintiff and her high-risk pregnancy that the plaintiff said Dr. Abedi had displayed. For example, Dr. Abedi testified:

> She [the plaintiff] liked to make a story ... [s]he goes to so many doctors. One doctor could not cure her. I could cure her. This is so funny, this is silly.... Once she come to me ... and she says she wants to become pregnant. I said, "What are you asking me, you want to become pregnant?" It was just like a joke for me.... it's eight years I worked for Rhone–Poulenc, even one day I

> did not take [off] ... [Human Resources] says we cannot make him [the plaintiffs' temporary replacement] full-time. I was surprised. "Why can't you make him full-time?" They said, "We are waiting for Natalie.... everybody expected when she had her baby she would come back, or at least maybe they hear something from her ... [they] said we cannot hire anybody because Natalie will come back...."

**5.** The defendant argued at trial and repeats the argument in its briefs that the written notices that the plaintiff sent to the defendant about when she intended to return to work were sent to the defendant's "benefits" employees, and not directly to the human resources employee who made the decision, after the plaintiff had 6 months of short-term disability leave, to make the plaintiff's temporary replacement permanent. However, the defendant's benefits department was a part of the human resources department. The defendant's human resources employees conceded at trial that it would have been easy for them to obtain the information contained on forms sent by the plaintiff to the benefits employees. The plaintiff was following the defendant's instructions in sending the forms to the benefits department. The defendant's arguments were considered by the jury in determining whether the defendant acted reasonably.

After the birth of her child, the plaintiff called her workplace manager, Okey Groves, to tell him about the birth. Neither the plaintiff nor her manager recalled at trial whether they had discussed the plaintiff's anticipated date for returning to work.[6]

Sometime in late December or early January of 1996, Dr. Abedi again asked that Mr. Fuller be made a full-time employee. On January 9, 1997, the 6-month "job protection" period in the medical leave policy having elapsed, Mr. Fuller was given permanent status, in accord with Dr. Abedi's wishes, effectively eliminating the plaintiff's job. The plaintiff, who still assumed that the defendant expected her to return to work in March of 1997, was not advised of this action.

In February of 1997, the plaintiff was released to return to work by her obstetrician, conditioned upon approval by her hypertension doctor. On March 1, 1997, that doctor agreed. The plaintiff reported to work on March 3, 1997. She first reported to the plant physician, as the defendant's medical leave policy required. The physician cleared the plaintiff, and she then went to the defendant's human resources division. She was told there that she had no job, because there were no positions open in her lab.

The plaintiff had been making $44,000 a year working for the defendant. As previously noted, her husband had quit his previous job to work at home, so as to better raise their child; and his work at home was less remunerative than his previous job, with no medical benefits. In the aftermath of the plaintiff losing her job with the defendant, she was unable to keep up payments on her family's medical insurance. She and her husband expended most of their $58,000 savings to pay off their debts and to live.

The plaintiff was unable to find comparable work after she left working for the defendant. She experienced emotional distress as a result of her job loss and unemployment.[7]

## B.

### West Virginia Human Rights Action

The plaintiff filed suit and went to trial against the defendant on her claim under the

---

6. The defendant's medical leave policy placed the responsibility on Mr. Groves, as the plaintiff's manager, to ascertain when an employee was expected to return to work from medical leave. See note 3 supra. Mr. Groves freely admitted at trial that he did not contact the plaintiff at any time during the period when she was on leave to inquire about her anticipated return-to-work date. However, he gave a reasonable explanation for this omission—he had no idea that the policy gave him this responsibility. Moreover, no one, including the defendant's human resources department or Dr. Abedi, had told the manager that the defendant's policy gave him this responsibility. In fact, the defendant's human resources administrator had instructed the plaintiff's manager not to contact the plaintiff during her leave—because Dr. Abedi had told the human resources administrator that the plaintiff had characterized Dr. Abedi's behavior toward the plaintiff as "harassment."

7. On this issue, the plaintiff testified:

Yes, I have been withdrawn. I didn't speak to my parents. I have avoided anywhere around here where I might run into people I know, because it's a small town. Charleston's a big city in a small town, and you run into people. So if I go out, I head towards Huntington, because I don't want to see people, because it's just—I always get the remark, "Hey, you still at the plant?" You know, "You still down there?" "No, I'm not." "What happened?" "I had a baby."

And they look at you funny. "Well, they can't do that." "Well, they did." And I don't know—the best example, I mean, my dad, my dad asked me what I did—"You had to have done something. They don't just let people go like that." And that's just the kind of remarks I would get. Nobody believes—"They don't do things like that." I got that when I went to the unemployment service.

I was fired for having a baby. That's as simple as it is.

Q. If it's possible, can you describe what was the lowest point for you after you were fired?

A. Probably when I—suicidal at times. I had insurance when I was in my car, and I would think of having an accident because I knew then, "Hey, there's be money to take care of Conner and Stephen then." But there's no guarantees in those car accidents that you'll die. But I'm getting over that part. My boy does need me.

Q. The final question: As you sit here today and looking back in hindsight, are you aware of anything you could have done that would have guaranteed that you would have had a job once the doctor released you to return to work?

A. I don't know of anything unless I would have risked the life of my baby and ignored my doctor's advice and went back to work.

West Virginia Human Rights Act, *W.Va. Code,* 5–11–1 *et seq.,* ("the Act" or "the Human Rights Act") and specifically *W.Va.Code,* 5–11–9 [1992] [8], which stated in pertinent part:

It shall be an unlawful discriminatory practice . . . [f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is blind or handicapped[.]

■ We set forth in Syllabus Point 2 of *Skaggs v. Elk Run Coal Co.,* 198 W.Va. 51, 479 S.E.2d 561 (1996) the elements that a plaintiff must prove in a claim of disability discrimination:

To state a claim for breach of the duty of reasonable accommodation under the West Virginia Human Rights Act, W.Va.Code, 5–11–9 (1992), a plaintiff must allege the following elements: (1) The plaintiff is a qualified person with a disability; (2) the employer was aware of the plaintiff's disability; (3) the plaintiff required an accommodation in order to perform the essential functions of a job; (4) a reasonable accommodation existed that met the plaintiff's needs; (5) the employer knew or· should have known of the plaintiff's need and of the accommodation; and (6) the employer failed to provide the accommodation.

■ We also stated in Syllabus Point 3 of *Skaggs:*

Under the West Virginia Human Rights Act, W.Va.Code, 5–11–9 (1992), in a disparate treatment discrimination case involving an employee with a disability, an employer may defend against a claim of reasonable accommodation by disputing any of the essential elements of the employee's claim or by proving that making the accommodation imposes an undue hardship on the employer. Undue hardship is an affirmative defense, upon which the employer bears the burden of persuasion.

The defendant does not contest that the plaintiff's high-risk pregnancy, complicated by medical conditions, met the legal test of a disability. The defendant also does not contest that it had ample knowledge of the plaintiff's disabling condition.

The defendant's defense at trial boiled down to the argument that it was unreasonable for the defendant to be required to hold the plaintiff's job open for her after 6 months had passed.

Why did the defendant say at trial that such an accommodation was unreasonable?

Because, argued the defendant, the plaintiff failed to communicate with the defendant about the plaintiff's intent to return to work. The defendant contended that it had no idea when—or even whether—the plaintiff was going to return to work.[9]

---

**8.** In 1998 the Legislature replaced the term "handicap" in the Act with the synonymous term "disability." *W.Va.Code,* 5–11–3 [1998]. Although the instant case arose under the prior statutory language, in this opinion we generally use the most recent term and cite to the 1998 revision of the statute.

**9.** Repeatedly emphasizing this fundamental theory of the case, the defendant's counsel stated to the jury, *inter alia,* as follows:

. . . you don't see . . . a single phone call, a single letter from Ms. Haynes to . . . her immediate supervisor . . . [or] the human resource contact . . . [or the department head at] . . . Human Resources, not the first phone call, not the first note, not the first word. . . . What would you do if you were upset by that [6–month policy]? Would you pick up the phone? I sure as heck would. If my job was so important to me, I would have picked up the phone. Natalie Haynes did not. If my job was that

important to me, I would have written a letter . . . Natalie Haynes did not . . . *if there had been one phone call in the six month period covered by that leave of absence policy, we wouldn't be here.* . . . for the entire period of time that she's away from work, nobody knows when she's coming back. . . . She didn't communicate to us what she was going to do. Didn't communicate to her supervisors what she was going to do. . . . [The plaintiff's manager] Okey doesn't know whether she's coming back or if she's coming back, when. He doesn't want to call her, because if he calls her, he's going to harass her. So he doesn't call her. The decision is made, "Let's get John Fuller on board." . . . If Ms. Haynes . . . had sought to achieve that balance between family and the job that she so contends she wanted, she would have placed that phone call, she would have written that letter, she would have sent that letter. *And I submit to you that if she had done that, we wouldn't be sitting here to-*

In other words, the defendant relied at trial on trying to persuade the jury that the cause of the plaintiff's job loss was the plaintiff's failure to make it clear to the defendant that she intended to return to work within a reasonable period of time after her child was born. As the defendant's counsel argued: ". . . if there had been one phone call . . . we wouldn't be here . . . if she had done that, we wouldn't be sitting here today."

The problem with this defense, however, as the discussion in the footnote shows, is that it was not compellingly supported in the evidence.[10]

> *day.* . . . even though she had a cell phone with her in the hospital, she didn't use that cell phone to call Okey Groves. She didn't use that cell phone to call Joyce [Adkins]. She sure didn't use it to call Dr. Abedi. She had opportunity to call somebody or drop them at note at that point and say, "Look, I've got the policy here, I understand that my job can be filled. You need to know that I'm going to be back at work."
>
> (Emphasis added. The order of these excerpts, taken from various places in counsel's remarks to the jury, is rearranged somewhat from their order at trial.)
>
> The defendant did not contend at trial that it would have been a financial or business hardship for the defendant to have kept the replacement worker on temporary status for another 2 or 3 months after January 9, 1997, if the defendant had been reasonably certain that the plaintiff was going to return to work.

10. For example, the evidence tended to show that the plaintiff had indicated to the defendant from the beginning of her leave that she was taking medical leave for the duration of her pregnancy, and that she intended to return to her employment for the defendant after her child was born. There was no evidence that the plaintiff had ever indicated otherwise to anyone. The plaintiff could point to several written communications sent to the defendant during her leave period indicating the plaintiff's intent to return to work in March of 1997, after her child was born.

The plaintiff could also point out that the plaintiff's manager, who had the specific responsibility under the medical leave policy for ascertaining the plaintiff's return date (if indeed there were any meaningful uncertainty), had not fulfilled that responsibility. Moreover, the person who was effectively responsible for the manager's failure to contact the plaintiff was Dr. Abedi—who (the evidence tended to show, taken in the light favorable to the plaintiff) had a dislike for the plaintiff, and for her taking of medical leave due to her pregnancy.

Therefore, it not surprising that the jury concluded (1) that the defendant's "just one phone call" explanation/excuse for terminating the plaintiff's job was not a viable defense; and (2) that the termination of the plaintiff's job after 6 months, instead of holding it open for another 3 months, was, in fact and in law, an impermissible failure to reasonably accommodate the plaintiff's medical disability.

Upon such a determination, the jury awarded the plaintiff $21,000 in back wages; $21,000 in damages for humiliation and embarrassment, etc.; and $58,000 in punitive damages.[11] The circuit court did not have to

> It was at best a weak argument for the defendant to suggest that the plaintiff's opinion that Dr. Abedi had been harassing the plaintiff effectively prohibited the defendant—a large and sophisticated corporation—from making a reasonable inquiry to ascertain when the plaintiff intended to return to work. Moreover, the jury would have been justified in concluding that the defendant, despite its protestations to the contrary, did not have a substantial reason to doubt that the plaintiff intended to return to work after her child was born.
>
> Even more pointedly, the jury could have concluded that Dr. Abedi—after her first effort to hire the replacement worker as a permanent employee was stymied by the protection afforded to the plaintiff by the medical leave policy—deliberately renewed her effort at the earliest possible opportunity, and with a full awareness that the plaintiff would effectively lose her job as a result of Dr. Abedi's action.
>
> All in all, the plaintiff had an ample basis to argue, and the jury had an ample basis to conclude, that the defendant's theory of the case—that the elimination of the plaintiff's job was the plaintiff's failure to make "just one phone call"—was less than meritorious. Indeed, the jury could have readily concluded that the defendant had unreasonably failed to make "just one phone call"—to the plaintiff.
>
> Finally, the jury could also readily question and reject the contention by the defendant that it was a "reasonable accommodation"—for the condition of a high-risk pregnancy—to hold a job open for a period of time that expired 1 month *before* the pregnant woman's due date.

11. The completed verdict form, as read into the record by the circuit judge, stated as follows, in pertinent part:

> Question No. 1: "Do you find that plaintiff Natalie Haynes has proved by a preponderance of the evidence all of the following: She is a qualified person with a disability; Defendant Rhone–Poulenc, Inc. was aware of her disability; she required an accommodation in order to perform the essential functions of her job; a

address the reinstatement issue, because in the middle of the trial, the defendant offered to reinstate the plaintiff to a chemical technologist job—and she accepted the job offer.

## II.

### Standard of Review

We review questions of law arising from the proceeding below *de novo.* We view the evidence, and the evidentiary and inferential determinations that were within the province of the jury, in the light most favorable to the party who prevailed—in this case, the plaintiff. As we have stated:

> In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Syllabus Point 5, *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied,* 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984).

reasonable accommodation existed that would meet her needs; Defendant Rhone–Poulenc, Inc. knew or should have known of her needs and of accommodation; and Rhone–Poulenc, Inc. failed to provide the accommodation?" Answer: "Yes."

No. 2: "By answering yes to Question No. 1, you have found the Plaintiff Natalie Haynes has proved by a preponderance of the evidence her claim that the Defendant Rhone–Poulenc, Inc. discriminated against her based upon her disability by breaching its duty to reasonably accommodate her disability.

What, if any, is the amount of damages, stated in dollars, that Plaintiff Natalie Haynes proved by a preponderance of the evidence she suffered as a proximate result of the actions by Defendant Rhone–Poulenc, Inc.?" "Back wages, if any," and there's a range, "$16,700 to $24,829." The verdict is $21,000.

## III.

### Discussion

#### A.

#### "Qualified Person With A Disability" and "Reasonable Accommodation"

▮ The defendant argues that the verdict for the plaintiff should be overturned because as a matter of law, the plaintiff did not establish the first element in the *Skaggs* formulation—that the plaintiff was a "qualified person with a disability."

The defendant argues that if a disability temporarily but entirely precludes a person from performing the duties of a job (even if given on-the-job accommodation) and requires the person to take a temporary leave of absence from work because of the disabling condition, then the person is not "able and competent to perform the services required[,]" *W.Va.Code,* 5–11–9(1) [1998], and is not "*currently* capable of performing the work...." 77 CSR 1–4.3 [1994] (emphasis added).

The defendant contends that granting a leave of absence to an employee who temporarily cannot work because of a disability cannot be a potential form of required accommodation under disability anti-discrimination laws—because the threshold requirement that gives rise to an employer's duty to provide reasonable accommodation is the employee's "present" or "current" ability to do the work, with accommodation.

"Compensatory damages for humiliation, embarrassment, annoyance, inconvenience, emotional distress, mental anxiety, loss of enjoyment of life, loss of self-esteem." The verdict is $21,000.

Question No. 3: "Do you find by a preponderance of the evidence that the conduct of Defendant Rhone–Poulenc, Inc. was oppressive, fraudulent, willful, wanton, malicious, reckless disregard for the rights of the Plaintiff Natalie Haynes?" Answer: "Yes."

Question No. 4: "What, if any, is the amount of punitive damages stated in dollars that you find should be awarded to Plaintiff Natalie Haynes and against Defendant Rhone–Poulenc, Inc. to be appropriate under the facts of this case and in light of the Court's instructions?" Punitive damages verdict: $58,000. The circuit court also awarded attorney's fees, the amount of which is not challenged on appeal.

In other words, the defendant argues that a person who is temporarily unable to perform the duties of their job, even with on-the-job accommodation, is not entitled to the protections of the West Virginia Human Rights Act. The defendant contends that under the Act, the "reasonable accommodation" requirement cannot and does not include granting a temporary leave of absence to an employee who is temporarily unable to perform the duties of their job due to a disability.

We discuss *infra* the substantive legal merits of this contention by the defendant. However, as a threshold matter, we determine that the defendant's reliance on this argument in the instant appeal is fatally undercut by a circumstance that is prior to the legal merits of the defendant's argument. That circumstance is the fact that the defendant took a different position at trial, and therefore cannot now raise this argument in asserting error in the proceedings below.

Specifically, at an instructions conference before the final arguments of counsel, the defendant's counsel proposed the following instructional language for the charge to the jury:

Some disabilities may require the disabled employee to take a leave of absence, and this may be one possible reasonable accommodation to allow the employee an opportunity to recover from the disability and return to their job.

The defendant's counsel also re-stated this principle of law in a colloquy in the instructions conference:

Plaintiff's counsel: ... I think it's important for them [the jury] to understand that a leave of absence for the disabled employee may be a reasonable accommodation, depending on the facts.

Defendant's counsel: We don't dispute that it [a leave of absence] may be a reasonable accommodation....

The defendant also agreed to an instruction that stated:

In determining whether a reasonable accommodation existed which would have permitted the plaintiff to have performed the essential functions of her job, you may consider the length of time that the plaintiff was required to be absent from her job. (Emphasis added.)

Given the foregoing positions taken by the defendant at trial, the defendant cannot now contend on appeal that the plaintiff was not entitled to assert that the defendant may be required, under our Human Rights Act's protections against disability discrimination, to provide a leave of absence as a reasonable accommodation for a worker like the plaintiff, who is temporarily unable to work due to a disability. Thus, on this assignment of error, the defendant cannot prevail in the instant appeal.

However, it appears that the legal question of whether an employee who is temporarily unable to work because of a disability is entitled to the protections of the Act, and whether a leave of absence for such a person may be a required reasonable accommodation, are issues that we have not previously addressed. Both parties have briefed the issues and they are important ones for employers and employees. Consequently, we address them.

Initially, we observe that the reading of our Human Rights Act that the defendant is urging upon this Court defies common sense.

Consider the hypothetical of a employee with a disability who is unable to work for a week, due to a medical problem arising out of the disability—and who therefore, with the employer's permission, takes a 1-week leave. What if this employee is then fired during that week, while the employee is unable to work?

The defendant's legal position, logically extended, would view such an employee, during that week (at the time of the discriminatory act—the termination), as not "*able and competent* to perform the services required" (*W.Va.Code*, 5–11–9(1) (1992)); and as not "*currently* capable of performing the work and can do the work ..." 77 CSR 1–4.3 [1994] (emphasis added). Such an employee, according to the defendant's reading of our Human Rights Act, is not a "qualified person with a disability" during a period of time when the employee is unable to work; and therefore, the employee has no standing to

claim the protections of our Human Rights Act.

It is difficult to find coherence, common sense, or persuasive force in a legal position that would strip the protection of the law against disability discrimination from an employee with a disability that requires the employee to miss work for a week—or indeed, logically extended, even for a day!

The defendant directs our attention to a recent case where this Court addressed the issue of whether a person who is unable to work can be a "qualified person with a disability" who is entitled to the protections of the Act, *Hosaflook v. Consolidation Coal Co.*, 201 W.Va. 325, 497 S.E.2d 174 (1997).

In Syllabus Point 6 of *Hosaflook*, we held:

In order to establish a prima facie case of handicap discrimination pursuant to *W.Va.Code*, 5–11–9 [1992] of the West Virginia Human Rights Act, which provides that it is unlawful "[f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is ... handicapped[,]" a claimant must prove, *inter alia*, that he or she is a "qualified handicapped person" as that term is defined in 77 C.S.R. § 1–4.2 [1991]. 77 C.S.R. § 1–4.2 [1991] defines "qualified handicapped person" as "an individual who is able and competent, with reasonable accommodation, to perform the essential functions of the job in question." Furthermore, 77 C.S.R. § 1–4.3 [1991] defines "able and competent" as "capable of performing the work and can do the work[.]" An individual who can *no longer* perform the essential functions of a job either with or without reasonable accommodation and,

thus, who is receiving benefits under a salary continuance plan which does not provide otherwise, is not performing the essential functions of a job by being a benefit recipient. Therefore, that person is not a "qualified handicapped person" within the meaning of the West Virginia Human Rights Act.

(Emphasis added.) [12]

In *Hosaflook*, we addressed the situation of a person who was permanently and totally disabled, and who "by his own admission, cannot presently and *will not in the future ever* be able to perform the job of mine foreman, either with or without reasonable accommodation...." 201 W.Va. at 331, 497 S.E.2d at 180 (emphasis added).

In those circumstances, we found that Mr. Hosaflook, who could "no longer" work at his job—with or without reasonable accommodation—could not be a "qualified handicapped person" for purposes of asserting that the denial of certain disability benefits violated the Human Rights Act.

The situation in *Hosaflook* is a far cry from the plaintiff's situation in the instant case. It would be entirely incorrect to say that the plaintiff fell within the category defined in *Hosaflook*—a person who could "no longer" perform her job. Rather, the plaintiff needed a leave of absence until her disabling medical condition could improve so as to permit her to return to and perform her job. The *Hosaflook* case is therefore unpersuasive on behalf of the position advanced by the defendant in the instant case.[13]

There is substantial authority in the case law arising out of the federal Americans with Disabilities Act, 42 U.S.C. 12101, *et seq.* [1990] ("the ADA") holding that a medical leave of absence for a person with a disability

---

12. The author of this opinion dissented in *Hosaflook*, stating that the final verdict was not yet in—in a national, jurisprudential sense—on the issues that this Court addressed in *Hosaflook*. And in fact, since *Hosaflook* was decided, two federal circuit courts have taken a position contrary to this Court's decision in *Hosaflook*. *See Ford v. Schering–Plough Corp.*, 145 F.3d 601, 604–05 (3d Cir.1998), *cert. denied*, 525 U.S. 1093, 119 S.Ct. 850, 142 L.Ed.2d 704 (1999); *Castellano v. The City of New York*, 142 F.3d 58, 67 (2d Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct.

276, 142 L.Ed.2d 228; *see also Lewis v. Aetna Life Ins. Co.*, 982 F.Supp. 1158, 1160–61 (E.D.Va.1997).

13. The defendant also cites us to *Ranger Fuel v. West Virginia Human Rights Commission*, 180 W.Va. 260, 376 S.E.2d 154 (1988). Our holding in that case, however, did not address the situation of a person who was able to work but required a temporary leave of absence due to conditions arising out of their disability.

who is temporarily unable to perform the functions of their job is a form of accommodation that an employer may be required to offer.[14]

In *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869 (9th Cir.1989), *cert. denied*, 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 28, the court found that an extended leave of absence may be a reasonable accommodation for a disabled employee. Kimbro suffered from "cluster migraines," acute headaches which occurred several times per day, and caused debilitation over a period of weeks or months. Kimbro was discharged for excessive absenteeism and sued under Washington's antidiscrimination statute. He alleged, *inter alia*, that his employer had failed to reasonably accommodate him by not providing him with a leave of absence—to recover from the migraine episode that he was experiencing at the time of his termination, and to seek long-term treatment that might alleviate the condition.

Following trial, the district court found no handicap discrimination; on appeal, the circuit court reversed. Noting that Washington's statute was enacted to address the "significant impediments that confront the disabled in the workplace," *Kimbro*, 889 F.2d at 873, the court stated:

> As long as at the time of Kimbro's termination, there were "plausible reasons to believe that the handicap [could have been] accommodated" by a leave of absence, ARCO is responsible for its failure to offer such a leave.

889 F.2d at 878.

The court noted that "[a]n employer bears the burden of establishing that a proposed accommodation 'would impose an undue hardship on the conduct of [its] business.' " *Kimbro*, 889 F.2d at 878. Finding that the

employer had failed to prove that an extended leave of absence would have imposed an undue burden on its operations, the court found unlawful discrimination. The court reasoned:

> [I]t was clearly plausible that a leave of absence in 1981 would have provided Kimbro with an opportunity to endure the 1981 acute episode and then return to work unimpaired for the foreseeable future. Moreover, at the time of his discharge, it was also plausible that a prolonged leave from work would have given Kimbro and his physicians an opportunity to design an effective treatment program. While it is altogether possible that Kimbro's migraine episodes may have recurred upon his return to work following a leave of absence, such a possibility does not foreclose a finding of liability for failure to accommodate Kimbro's migraines in 1981. As long as a reasonable accommodation available to the employer could have plausibly enabled a handicapped employee to adequately perform his job, an employer is liable for failing to attempt that accommodation.

889 F.2d at 878–879.

The *Kimbro* approach to a leave of absence was also applied by the court in *Cain v. Hyatt*, 734 F.Supp. 671 (E.D.Pa.1990). *Cain* involved a lawyer with AIDS who was fired after he was hospitalized. The *Cain* court, citing *Kimbro*, stated:

> The duty of accommodation dictated that Hyatt could not remove the plaintiff from the position during his first AIDS-related hospitalization without affording him an opportunity to return to work and endeavor to satisfy its demands. To that end, the defendants were obligated to permit the

---

**14.** We stated in *Hosaflook* that "cases decided under the ADA are helpful in deciding our cases under the West Virginia Human Rights Act," 201 W.Va. at 332 n. 10, 497 S.E.2d at 181 n. 10, and we relied on such cases therein. *See also Strawderman v. Creative Label Co., Inc.*, 203 W.Va. 428, 431 n. 2, 508 S.E.2d 365, 368 n. 2 (1998) (*per curiam*). In *Skaggs v. Elk Run Coal Co.* 198 W.Va. 51, 68, 479 S.E.2d 561, 578 (1996), we noted that the Legislature amended the Human Rights Act to define disability to bring the law into line with the federal authorities.

The defendant argues that federal case law is irrelevant to our inquiry in the instant case because there are differences in terminology between our Act and regulations and comparable ADA provisions regarding who is a protected person and when the person is protected by the law. We have reviewed the defendant's arguments and we find that any such differences do not render federal case law under the ADA unhelpful in addressing the issues before us in the instant case.

plaintiff to exhaust his sick and vacation days and then, if necessary, place him on a medical leave of absence until he could return to his former job or until the situation posed an undue hardship on Hyatt. *Cain*, 734 F.Supp. at 683.[15]

15. A number of cases have addressed the reasonableness of time off from work for recovery from the disabling condition of alcoholism. In these cases, as in *Kimbro*, where there is a good prospect of recovery and time off is not shown to be unduly burdensome, the failure to permit such an accommodation has been held to be actionable.

In *McElrath v. Kemp*, 714 F.Supp. 23 (D.D.C. 1989), the court found that where there is some likelihood of the employee's recovery, and where a leave of absence without pay will not create any undue hardship on the employer, the discharge of an alcoholic employee without providing the opportunity for a leave constitutes unlawful handicap discrimination.

Similarly, in *Schmidt v. Safeway Inc.*, 864 F.Supp. 991 (D.Or.1994), the termination of an alcoholic truck driver was held to be discriminatory where he could have been afforded, without undue hardship, an opportunity to seek treatment. In *Schmidt*, the plaintiff was a truck driver whose disability was alcoholism. The requested accommodation was a leave of absence to undergo treatment. The court also stated:

> [A] leave of absence to obtain medical treatment is a reasonable accommodation if it is likely that, following treatment, plaintiff would have been able to safely perform his duties....
>
> \*     \*     \*
>
> Here, the accommodation was a leave of absence to undergo treatment. Defendant's MRO [medical review officer] said plaintiff would be qualified if he received that accommodation. If plaintiff was initially qualified to drive a truck, which defendant stipulates is true, and with accommodation he would continue to be qualified, then plaintiff is a qualified individual with a disability who is protected by the ADA.

864 F.Supp. at 996–998.

Certainly there are limits to an employer's duty to wait while an employee recovers from a disability. In *Myers v. Hose*, 50 F.3d 278 (4th Cir.1995), the court addressed the question of how far an employer need go in accommodating an alcoholic bus driver with other disabilities who could not presently perform his job duties. The court stated in *Myers*:

> [R]easonable accommodation does not require the County to wait indefinitely for Myers' medical conditions to be corrected, especially in light of the uncertainty of cure.

50 F.3d at 283.

Where there was no expectation as to when, if ever, Myers might be able to return, and where the county needed to promptly fill transit positions with qualified drivers, "lest public vehicles go unmanned," the employer had proven that leave time was unduly burdensome. *Myers*, 50 F.3d at 283. However, *Myers* does not stand for the proposition that all employees who are not at all times capable of performing the work are excluded from the law's protection, or that a leave of absence may never be a reasonable accommodation.

The analysis by the District Court in an unpublished case, *Soodman v. Wildman, Harrold, Allen & Dixon*, No. 95–C–3834, February 10, 1997, 1997 WL 106257 (N.D.Ill.) is instructive. In *Soodman*, as in the present case, the plaintiff was ordered by her physician to stay at home during the term of her pregnancy. Obviously, when an employee is required by her physician to stay home during the term of her pregnancy, such a leave of absence is temporary and, once the child is born, the employee is capable of performing the essential functions of the job again.

In holding that the ADA does allow a temporary leave of absence to be a required reasonable accommodation, the District Court in *Soodman* held:

> The ADA's legislative history, the Equal Employment Opportunity Commission's interpretive guidelines and case law addressing the issue make clear that one type of reasonable accommodation may be a temporary leave of absence to obtain necessary medical treatment. *See* H.R.Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 63 (reasonable accommodation may include providing unpaid leave days); 29 C.F.R. Pt. 1630 App. [Sec.] 1630.2(*o*). In a somewhat analogous situation, one district court has specifically held that a temporary leave of absence to obtain medical treatment is a reasonable accommodation if it is likely that, thereafter, the employee will be able to perform adequately. *Schmidt v. Safeway, Inc.*, 864 F.Supp. 991, 996–97 (D.Or.1994) (temporary leave requested to attend alcoholic treatment program).

The employer in *Soodman* further failed to establish why such an accommodation was unreasonable under the facts. Just as defendant in the present case hired a temporary contract employee to cover the initial months of Natalie's absence, the employer in *Soodman* used a rotating legal secretary to make up for Mrs. Soodman's absence. Furthermore, neither the employer in *Soodman* nor defendant in the present case provided any evidence that granting such a temporary leave of absence created a financial undue hardship. In the absence of such evidence, clearly a temporary leave of absence for a pregnant employee, who is ordered by her physician to stay home during her pregnancy, may be a required reasonable accommodation.

*See also Criado v. IBM Corp.*, 145 F.3d 437 (1st Cir.1998); *Haschmann v. Time Warner Entertainment Co., L.P.*, 151 F.3d 591 (7th Cir.1998); *Hudson v. MCI Telecommunications Corp.*, 87 F.3d 1167 (10th Cir.1996); *Hankins v. The Gap, Inc.*, 84 F.3d 797 (6th Cir.1996); *Rascon v. U.S. West*

This Court held in *Skaggs v. Elk Run Coal Co.*, 198 W.Va. 51, 479 S.E.2d 561, 577 (1996), and in *Morris Memorial Convalescent Nursing Home v. West Virginia Human Rights Commission*, 189 W.Va. 314, 431 S.E.2d 353 (1993), that the purpose of the Human Rights Act requires that the process of determining what constitutes reasonable accommodation in a particular case, be flexible, in order to balance the interests of the employee in continued employment and the interests of the employer in avoiding unreasonable burdens or expenses.

This Court in *Skaggs*, 198 W.Va. at 67, 479 S.E.2d at 577, specifically refers to flexibility in "schedules." To hold that a leave of absence is, as a matter of law, unreasonable—that disabled employees may never miss work due to their disability without losing the protections of the Act—would be to abandon this flexibility, and to undermine the intent of the Human Rights Act.[16]

■ Based on the foregoing reasoning and authorities, we hold that a "qualified disabled person" who is protected by the West Virginia Human Rights Act, *W.Va. Code*, 5–11–1 *et. seq.* and regulations issued pursuant thereto, includes a person who has a disability and is temporarily unable to perform the requirements of the person's job due to their disability, with or without accommodation. We also hold that under the West Virginia Human Rights Act, *W.Va.Code*, 5–11–1 *et. seq.*, required reasonable accommodation may include a temporary leave of absence that does not impose an undue hardship upon an employer, for the purpose of recovery from or improvement of the disabling condition that gives rise to an employee's temporary inability to perform the requirements of his or her job.[17]

Therefore, the appellant's assignment of error on the "qualified individual with a disability" issue is without merit.

## B.

### Punitive Damages

■ The second legal issue that we address in the instant appeal is whether a jury has the right to consider an award of punitive damages in an action under the West Virginia Human Rights Act, *W.Va.Code*, 5–11–1 *et seq.* This issue was properly preserved by the defendant at trial, and properly raised on appeal.

The remedy or relief that is available to a person who files a lawsuit in circuit court asserting a claim under our Human Rights Act, including the remedy of an award of monetary damages, is established by *W.Va. Code*, 5–11–13(c) [1998], which states:

> In any action filed under this section, if the court finds that the respondent has engaged in or is engaging in an unlawful discriminatory practice charged in the complaint, the court shall enjoin the respondent from engaging in such unlawful discriminatory practice and order affirma-

<hr>

Communications, Inc., 143 F.3d 1324 (10th Cir. 1998); *Norris v. Allied–Sysco Food Services, Inc.*, 948 F.Supp. 1418 (N.D.Cal.1996); *Dockery v. North Shore Medical Center*, 909 F.Supp. 1550 (S.D.Fla.1995).

**16.** It would be inconsistent with the flexibility that our law requires to permit a fixed or minimum guaranteed leave period to be determinative as a matter of law of what constitutes reasonable accommodation. As we discuss *infra*, the reasonableness of required accommodation and the issue of undue hardship is a case-by-case determination. In the instant case, the circuit court correctly instructed the jury that "the fact that an employer has adopted an employment policy does not mean that that policy complies or does not comply with the requirements of the West Virginia Human Rights Act." The Equal Employment Opportunity Commission takes the position that "[m]odifying workplace policies, in-

cluding leave policies, is a form of reasonable accommodation ... undue hardship cannot be based solely on the existence of a ... leave policy," EEOC, "Enforcement Guidance—Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act," http:www.eeoc.gov /docs / accommodation.html. This position is consistent with the case law that we discuss *infra*.

**17.** We want to make clear that in the context of this case, by disabling condition, we refer to a totally disabling medical condition of limited duration, so that following a temporary leave of absence for treatment and improvement, it is reasonably foreseeable that the plaintiff is likely to be able to return to work. We also note that nothing in our decision addresses the issue of whether, or requires that, a required accommodation of such a temporary leave of absence be paid leave.

tive action which may include, but is not limited to, reinstatement or hiring of employees, granting of back pay or *any other legal or equitable relief as the court deems appropriate.* In actions brought under this section, the court in its discretion may award all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, to the complainant. (Emphasis added.)

This language clearly and straight forwardly grants the circuit court the specific power to require affirmative actions, including hiring, reinstatement and payment of back pay—and also the power to award "any other legal or equitable relief as the court deems appropriate."

The plaintiff—and the *amicus curiae,* the West Virginia Human Rights Commission ("HRC")—argue that allowing an award of punitive damages gives the statute's language its literal meaning and makes it unnecessary to apply rules of construction or interpretation. *See Conrad v. ARA Szabo,* 198 W.Va. 362, 377, 480 S.E.2d 801, 816 (1996). They argue that punitive damages are well within the broad spectrum of remedies made available by the phrase "any other legal or equitable relief as the court deems appropriate," because the term "any legal relief" necessarily includes punitive damages.

In more detail, the plaintiff's and HRC's argument on this point is as follows. The awarding of money damages as a legal remedy is well-settled tradition in Anglo–American jurisprudence. *Wells v. Smith,* 171 W.Va. 97, 100, 297 S.E.2d 872, 875 (1982), *overruled on other grounds, Garnes v. Fleming Landfill,* 186 W.Va. 656, 413 S.E.2d 897 (1991). Historically, all remedies were divided between those available "at law" and those available "in equity." Injunctions and specific performance were types of relief sought in courts of equity. *See Black's Law Dictionary,* "equitable relief" 539 (6th ed.1990). Money damages were traditionally the type of remedy that courts of law awarded. *Id.* Under the West Virginia Human Rights Act, in circuit court, the "full array of legal and equitable remedies are obtainable."

*Vest v. The Board of Education of the County of Nicholas,* 193 W.Va. 222, 227, 455 S.E.2d 781, 786 (1995). For complainants who file Human Rights Act cases in circuit court, their claims sound in tort and traditional tort damages are available. *Dobson v. Eastern Associated Coal Corp.,* 188 W.Va. 17, 24, 422 S.E.2d 494, 502 (1992). Money damages are a historical legal remedy available under tort law theories. *Perilli v. Board of Education,* 182 W.Va. 261, 263, 387 S.E.2d 315, 317 (1989). Punitive damages have long been awarded in tort cases and are encompassed in the term "legal relief." *Garnes,* 186 W.Va. at 660, 413 S.E.2d at 901.

The plaintiff and the HRC contend that the Legislature has used the "any other legal and equitable relief" language to identified the broad spectrum of legal and equitable remedies available to trial courts in common-law causes of action. They argue that it follows logically from the plain meaning of *W.Va.Code,* 5–11–13(c) [1998] that the Legislature intended to include punitive damages under the West Virginia Human Rights Act.

Looking beyond the plain meaning of the Act, the plaintiff and HRC point out that the denial of opportunity based on such characteristics as disability runs "contrary to the principles of freedom and equality of opportunity and is destructive to a free and democratic society." *W.Va.Code,* 5–11–2 [1998]. Notably, this Court, in *Allen v. West Virginia Human Rights Commission,* 174 W.Va. 139, 324 S.E.2d 99 (1984), held that "every act of unlawful discrimination in employment ... is akin to an act of treason undermining the very foundations of our society." 174 W.Va. at 148, 324 S.E.2d at 108. Surely, they contend, punitive damages must be available in appropriate cases as a sanction against such undesirable conduct.

We are mindful that the Legislature, in *W.Va.Code,* 5–11–15 [1967], has directed that the provisions of the Act "shall be liberally construed to accomplish its objectives and purposes." This Court has consistently followed this "liberal construction" imperative in construing provisions of the Human Rights Act, including provisions related to remedy.[18]

---

**18.** *Dobson v. Eastern Associated Coal Corp.,* 188     W.Va. 17, 422 S.E.2d 494 (1992); *Casteel v.*

The plaintiff contends that the legislative purpose contained in the Human Rights Act contemplates not merely compensating victims of discrimination for violations of their human rights, but preventing violations of these rights. Prevention requires deterrence—and deterrence, argues the plaintiff, requires the possibility of a penalty for those whose actions are sufficiently culpable.

It cannot be disputed that allowing plaintiffs to recover punitive damages in appropriate cases in circuit court is in keeping with the principle of liberal construction and with the broad remedial purpose of the Act. As we have stated,

> ... the ADA and our Human Rights Act prescribe strong medicine to cure the social maladies of intentional and unnecessary denials of job opportunities to persons with disabilities. The medicine works through the laws' natural hortatory and educational effect and through their remedial provisions that empower courts to correct unlawful practices, make their victims whole, *and deter other acts of discrimination by attaching them to serious economic consequences.*

*Skaggs v. Elk Run Coal Co.*, 198 W.Va. 51, 64, 479 S.E.2d 561, 574 (1996) (emphasis added).

Previous rulings of this Court have recognized that the remedial language of the Human Rights Act was not intended to be narrow in the area of remedies and damages.

In *Casteel v. Consolidation Coal Co.*, 181 W.Va. 501, 383 S.E.2d 305 (1989), the employer argued that the lower court erred in awarding front pay because *W.Va.Code*, 5–11–10 [1987] did not specifically authorize such damages. This Court recognized that such damages are available within the statute's broad grant of remedial authority.

In *Dobson v. Eastern Associated Coal Corp.*, 188 W.Va. 17, 422 S.E.2d 494 (1992), this Court examined the remedial provisions of *W.Va.Code*, 5–11–13(c) [1983]. Echoing the argument made by the defendant in the instant case, the employer argued that since the statute contains no express provision for an award of front pay, this remedy is unavailable. However, this Court stated that the phrase "or any other legal or equitable relief as the court deems appropriate" means that damages for loss of future earning power are allowable where such an injury is shown. *Dobson*, 188 W.Va. at 24, 422 S.E.2d at 501.

In *West Virginia Human Rights Commission v. Pearlman Realty Agency*, 161 W.Va. 1, 3–4, 239 S.E.2d 145, 147–148 (1977), this Court similarly held that incidental damages were available under the West Virginia Human Rights Act, even if they were not explicitly mentioned in the statute.

Both parties to the instant appeal point out that in two previous cases, this Court has mentioned, but not decided, the issue of whether punitive damages are available under the Human Rights Act. *See Harmon v. Higgins*, 188 W.Va. 709, 711, 426 S.E.2d 344, 346 (1992) (statement in *dicta* that punitive damages are not an element of damages in Human Rights Act cases); *Vandevender v. Sheetz, Inc.*, 200 W.Va. 591, 608, 490 S.E.2d 678, 695 (1997) (*per curiam*) (Maynard, J., dissenting), *cert. denied*, 522 U.S. 1091, 118 S.Ct. 883, 139 L.Ed.2d 871 (1998) (dissenting to the majority's approval of a Human Rights Act verdict that included punitive damages); *see also Guevara v. K–Mart Corp.*, 629 F.Supp. 1189, 1190–91 (S.D.W.Va.1986) (statement in *dicta* opining that punitive damages are not available under the Act.) However, neither party to the instant appeal argues that these cases constitute precedential authority that constrains our decision on this issue in the instant case.

The defendant's principal argument in opposition to the availability of punitive damages under the Human Right Act is that the absence of a specific authorization for punitive damages in the Act indicates that punitive damages are not available—particularly

---

Consolidation Coal Co., 181 W.Va. 501, 383 S.E.2d 305 (1989); *see also Williamson v. Greene,* 200 W.Va. 421, 490 S.E.2d 23 (1997); *Skaggs v. Elk Run Coal Co.,* 198 W.Va. 51, 479 S.E.2d 561 (1996); *Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 457 S.E.2d 152 (1995); *Hanlon v.*

Chambers, 195 W.Va. 99, 464 S.E.2d 741 (1995); *Holstein v. Norandex, Inc.,* 194 W.Va. 727, 461 S.E.2d 473 (1995); *Paxton v. Crabtree,* 184 W.Va. 237, 400 S.E.2d 245 (1990); *May Dep't Stores Co. v. West Virginia Human Rights Commission,* 191 W.Va. 470, 446 S.E.2d 692 (1994) (*per curiam* ).

in light of the fact that punitive damages are specifically authorized in the West Virginia Fair Housing Act, *W. Va. Code*, 5–11A–1 to – 20.[19]

As previously noted, *W.Va.Code*, 5–11–13(c) [1992] of our Human Rights Act provides:

> In any action filed under this section, if the court finds that the respondent has engaged in or is engaging in an unlawful discriminatory practice charged in the complaint, the court shall enjoin the respondent from engaging in such unlawful discriminatory practice and order affirmative action which may include, but is not limited to, reinstatement or hiring of employees, granting of back pay or any other legal or equitable relief as the court deems appropriate. In actions brought under this section, the court in its discretion may award all or a portion of the costs of litigation, including reasonable attorney fees and witness fees, to the complainant.

*W.Va.Code*, 5–11A–14(c)(1) [1992] of the Fair Housing Act provides:

> In a civil action brought under subsection (a) of this section, if the court finds that a discriminatory housing practice has occurred ... the court may award to the

complainant actual and punitive damages, and ... may grant as relief, as the court deems appropriate, any permanent or temporary injunction or other order. . . .

In Human Rights Act claims, the relief "may include, but is not limited to" certain specific items of legal and equitable relief, and may also include "any other legal or equitable relief as the court deems appropriate." In Fair Housing Act cases, a court may award "actual and punitive damages" (legal remedies) and "permanent or temporary injunctions" (equitable remedies).

The plaintiff argues that the remedial provisions of both Acts provide for essentially the same broad range of legal and equitable remedies, using different words to accomplish the same purpose. We agree with the plaintiff. It appears to us that the two statutes use different approaches to reach the same result—giving circuit courts a broad grant of remedial powers to address a serious social problem. We do not infer from one statutory provision that uses one form of language to grant a broad range of remedial relief an intent to preclude such relief under another statute that can also be fairly read to include a similar broad range of available relief.[20]

**19.** The defendant cites to two cases from other jurisdictions that it says support the contention that the absence of specific language authorizing punitive damages in a human rights act means that they may not be awarded.

In *Carver v. Citizen Utilities Co.*, 954 S.W.2d 34 (Tenn.1997), the court addressed a statute where "actual damages" were provided for in court cases under the state's Human Rights Act—except in housing discrimination cases, where the Act specifically provided for punitive damages. The court in *Carver* found that the specific mention of punitive damages in one section of the statute indicated that they were excluded in other areas, where only "actual" damages are mentioned. Punitive damages could not be implied under a separate "catch-all" remedy section. The facts in *Carver* are significantly different from the facts in the instant case. The *Carver* court was dealing with a single statute. The differentiating language, "actual damages" versus "punitive damages," is not present in our case. The holding in *Carver* is not persuasive for the defendant in the instant case.

In *Thoreson v. Penthouse International, Ltd.*, 179 A.D.2d 29, 583 N.Y.S.2d 213 (1992), the court relied upon legislative history and the position of the State Division of Human Rights to

find that the legislature did not intend to include punitive damages under the New York Human Rights Act, even in court cases. In *Thoreson*, litigants who chose a court forum were not permitted greater relief than they could receive administratively—not the case in West Virginia. The *Thoreson* case is also not persuasive for the defendant.

**20.** If the lack of a specific mention of punitive damages in the Human Rights Act were a bar to their availability under the Act, the plaintiff contends that punitive damages would by logical extension not be available under the wrongful death act, *W.Va.Code*, 55–7–6 [1965]—because the wrongful death act also does not mention punitive damages. This Court held in Syllabus Point 4 of *Bond v. City of Huntington*, 166 W.Va. 581, 276 S.E.2d 539 (1981) that punitive damages are available in a wrongful death action, even though they are not specifically mentioned in the statute.

The defendant correctly points out that a number of our statutes in other areas, that set forth what remedies are available to a party, specifically provide for punitive damages. But we do not see how that fact establishes that the Legislature intended to include "actual" damages, but

If the Legislature had intended to exclude punitive damages from the broad remedial powers it granted to circuit courts to enforce the Human Rights Act, it could easily have done so in a far more direct fashion than the oblique, convoluted, and murky fashion that the defendant argues was used.

We do not intend to rewrite what the Legislature has written; therefore we adhere to a straight forward reading of the statute, and a reading that is consistent with our past approach to the statute. We hold that punitive damages are an available form of remedial relief that a court may award under the provisions of *W.Va.Code*, 5-11-13(c) [1998].

■ The question that follows this holding is whether the circuit court erred in allowing the issue of punitive damages to go to the jury.

This Court has stated that the question that a court must ask itself, in determining whether a jury can consider an award of punitive damages (in a case where they are legally permissible) is:

Do the facts and inferences in this case point so strongly and overwhelmingly in favor of the [defendant] to the extent that it did not act so maliciously, oppressively, wantonly, willfully, recklessly, or with criminal indifference to civil obligations that no reasonable jury could ... reach[ ] a verdict against the [defendant] on the issue of punitive damages?

*Alkire v. First Nat. Bank of Parsons*, 197 W.Va. 122, 129, 475 S.E.2d 122, 129 (1996).

In the instant case, the jury could have found that defendant—primarily through the conduct of Dr. Abedi, conduct that was never disavowed or repudiated by the defendant—acted toward the plaintiff in willful disregard and contradiction of the policies behind the

Human Rights Act and the protection that the Act affords to persons with disabilities.

Specifically, the jury could have found that Dr. Abedi was intolerant and disdainful of the plaintiff's seeking a job change and an extended medical leave due to her high-risk pregnancy—"she goes to so many doctors ... in eight years I did not take one day off."

In other words, the jury could have found that intolerance and disdain for the requests of a person with a disability for accommodation, and a desire to eliminate that accommodation at the earliest possible opportunity without a compelling economic reason, was the direct cause of the defendant not keeping the plaintiff's job open for her during and after her pregnancy.

And the jury was further entitled to find that the circumstances of that job elimination—just after the plaintiff's child was born, without any notice to the plaintiff, and with severe consequences to the plaintiff and her family—were especially aggravating, and certainly not what an employee who had given the defendant 15 years of loyal service deserved.

Based on our review of the entire record, we cannot say that no reasonable jury could have concluded that the defendant's conduct was malicious, oppressive, wanton, willful, reckless, or with criminal indifference to civil obligations. *Alkire, supra.*

■ The amount of punitive damages awarded, $58,000, coincided with the savings that the plaintiff expended after she left the defendant's employ. Considering the evidence of the defendant's wealth that went before the jury, the amount of punitive damages was modest.

■ The defendant's assignment of error with respect to the award of punitive damages is found to be without merit.[21]

to exclude "punitive" damages, in the Human Rights Act—when the Act's remedy section does not use the term "damages" (actual or punitive) at all, but rather grants circuit courts the power to award "any other" equitable and legal relief, in addition to reinstatement and back pay. Absent strong reasons to determine otherwise, "any other" means—"any other."

21. We note that nothing in this opinion authorizes the imposition of punitive damages in ad-

ministrative cases heard by the Human Rights Commission.

We also note that the punitive damages that are available as a form of "any other legal or equitable relief" in cases under the Human Rights Act are, of course, bounded and controlled by the standards that our law has set for the award of punitive damages generally. As we stated in *Alkire v. First Nat. Bank of Parsons*, 197 W.Va. 122, 129, 475 S.E.2d 122, 129 (1996):

The type of conduct which gives rise to punitive damages in West Virginia was first formulated in *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895), where the Court stated in Syllabus Point 4:

In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous.

Although there are tempting shorthand phrases to characterize the type of conduct which warrants punitive damage consideration, for example, "conscious indifference," "reckless, willful and wanton," "particularly egregious" we are still committed to the traditional rule announced in *Mayer* and cited with approval in a number of subsequent cases. (Citations omitted.)

Additionally, we stated in Syllabus Points 3, 4, and 5 of *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991):

3. When the trial court instructs the jury on punitive damages, the court should, at a minimum, carefully explain the factors to be considered in awarding punitive damages. These factors are as follows:

(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater.

(2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

(3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.

(4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.

(5) The financial position of the defendant is relevant.

4. When the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors:

(1) The costs of the litigation;

(2) Any criminal sanctions imposed on the defendant for his conduct;

(3) Any other civil actions against the same defendant, based on the same conduct; and

(4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff.

Because not all relevant information is available to the jury, it is likely that in some cases the jury will make an award that is reasonable on the facts as the jury know them, but that will require downward adjustment by the trial court through remittitur because of factors that would be prejudicial to the defendant if admitted at trial, such as criminal sanctions imposed or similar lawsuits pending elsewhere against the defendant. However, at the option of the defendant, or in the sound discretion of the trial court, any of the above factors may also be presented to the jury.

5. Upon petition, this Court will review all punitive damages awards. In our review of the petition, we will consider the same factors that we require the jury and trial judge to consider, and all petitions must address each and every factor set forth in Syllabus Points 3 and 4 of this case with particularity, summarizing the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage. Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law.

No error is assigned by the defendant with respect to the adequacy of the trial court's performance under *Garnes*; nor are we asked to review the award of punitive damages in the instant case pursuant to the specific *Garnes* factors.

We also note that the United States Supreme Court has recently addressed the standard for the award of punitive damages in a gender discrimination case, *Kolstad v. American Dental Association*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). The federal statute discussed in *Kolstad*, 42 USC 1981, allows for punitive damages in certain federal civil rights and ADA cases upon a showing of "malice or . . . reckless indifference to the federally protected rights of an aggrieved individual." *Id.* Our Human Rights Act, as we have noted, does not establish a statutory standard for the award of punitive damages, or indeed for any other "damages," but rather gives the circuit court the power to award "any other legal and equitable relief as the court deems appropriate." *W.Va.Code,* 5–11–13(c) [1998]. We turn to our established punitive damages jurisprudence for the appropriate standards. However, even assuming *arguendo* that the federal statutory standard for an award of punitive damages, as interpreted in *Kolstad*, were applicable to the instant case, we conclude that

## IV.

### Conclusion

For the foregoing reasons, the judgment of the circuit court is affirmed.[22]

Affirmed.

Justice DAVIS, deeming herself disqualified, did not participate in the decision in this case.

Judge FRED RISOVICH, II, sitting by special assignment.

MAYNARD, Justice, dissenting.

(Filed July 16, 1999)

I dissent in this case for three reasons. First, I believe that the appellant reasonably accommodated the appellee's disability. Second, I believe that punitive damages are not recoverable under West Virginia's Human Rights Act. Finally, even though the majority concludes that punitive damages are available under the Act, such damages should not be recoverable under the facts of this case.

At the outset, I note that I agree with the majority's holdings in Syllabus Points 3 and 4 that a "qualified disabled person" can include a person temporarily unable to perform the requirements of the person's job due to disability and that required reasonable accommodation may include a temporary leave of absence. These holdings appear to be in accord with the general view of courts. Also, as explained by the majority opinion, these holdings make sense. As aptly stated in Syllabus Point 3, the leave of absence must be temporary, not indefinite; it must not impose an undue hardship upon an employer; and the purpose of the leave of absence must be for the purpose of recovery from or improvement of the disabling condition that gives rise to an employee's temporary inability to perform the requirements of his or her job.

In this case, I believe that the appellant made every reasonable effort to accommodate the appellee, and that the appellee's problems were caused by her own failure to keep the appellant informed of when and if she would return to work. In June or early July, 1996, when the appellee requested leave, her doctor submitted a form to the appellant stating that the appellee's anticipated return to work was "3/1/97." This was an uncertain date nine months in the future. It is important to emphasize that the appellant's written policy provided for medical leave for up to 6 months, at full salary and benefits. Thereafter, an employee was eligible for continued "long-term disability" medical leave at a reduced salary. In addition, an employee's job would be kept open for him or her while on short-term disability benefits after which business demands may mandate that the position be filled. We can only presume that this "experienced, well-paid, skilled employee" was aware of this policy. In November, 1996, the appellee again notified the appellant of her anticipated return date. Upon receipt of this notice, the appellant reminded the appellee by letter of its medical leave policy. Nevertheless, this well-paid employee with a desirable job failed to notify her supervisors of her intention to return to work.

Contrast the appellee's conduct with that of the appellant. When the appellee learned she was pregnant, she requested a temporary work assignment change to which the appellant readily agreed. Shortly thereafter, the appellant granted the appellee's requested medical leave of absence. At the close of

---

the requisite malice and/or reckless indifference could have been found by the jury that would authorize its award of punitive damages.

**22.** The defendant suggests that our rulings in the instant case, if adverse to the defendant's position, should be made prospective only. However, the rulings in the instant case are not departures from previous holdings of this Court, and the law is not changed by our holdings herein. *Compare Skaggs v. Elk Run Coal Co., Inc.,* 198 W.Va. 51, 70, 479 S.E.2d 561, 580 (1996) (disability discrimination rule established by overrul-

ing previous decision was made prospective only). Additionally, there is no reason to believe that employers in this state, including the defendant, have been calculating their employment-related actions in reliance upon (1) the premise that employers may freely discriminate against persons with disabilities when such persons are temporarily unable to work—or (2), upon the premise that an employer will under no circumstances be liable for punitive damages when there has been a violation of the Human Rights Act. We therefore decline to adopt the defendant's suggestion.

the 6–month period, the appellant attempted to communicate with the appellee concerning whether or when she would return. All this time, the appellant was burdened with having to fill the appellee's position with another qualified person. Finally, the appellant ultimately rehired the appellee. In light of this, I believe that the appellant reasonably accommodated the appellee's disability.

Second, I disagree with the majority's holding on the availability of punitive damages under the Human Rights Act. In my recent dissent in *Vandevender v. Sheetz, Inc.*, 200 W.Va. 591, 608, 490 S.E.2d 678, 695 (1997), *cert. denied*, 522 U.S. 1091, 118 S.Ct. 883, 139 L.Ed.2d 871 (1998), I noted the general presumption that the Act does not provide for punitive damages.

According to *Dobson v. Eastern Associated Coal Corp.*, 188 W.Va. 17, 24, 422 S.E.2d 494, 501 (1992), "other legal and equitable relief" means that a plaintiff bringing a discrimination claim may generally recover damages available in tort. In *Harmon v. Higgins*, 188 W.Va. 709, 711, 426 S.E.2d 344, 346 (1992), however, this Court noted that the trial court had treated the sexual harassment case as a *Harless [v. First Nat. Bank*, 162 W.Va. 116, 246 S.E.2d 270 (1978)] action and not as a Human Rights Action, and stated that "punitive damages ... are allowed in a *Harless*-type case but are not an element of damages under the Human Rights Act." In *Guevara v. K–Mart Corp.*, 629 F.Supp. 1189, 1190–91 (S.D.W.Va.1986), Judge Haden noted that the case was pled as a *Harless* action rather than under the Human Rights Act, and stated that the plaintiff's "requested elements of damage are more extensive than those available under the [Human Rights Act]. For example, she seeks an award of punitive damages equal to the claimed amount of compensatory damages." (Footnote omitted). The majority's holding here is a significant departure from this general presumption.

Further, the plain language of the Act does not provide for punitive damages. The specific remedies provided for in W.Va.Code § 5–11–13(c) (1998), which are reinstatement, hiring, granting of back pay, court costs and

attorney fees, are designed to compensate the victims of unlawful discrimination for their resulting injuries. On the other hand,

> [t]he compensation of an injured party for his or her losses is not the purpose of punitive damages. "Punitive or exemplary damages are such as, in a proper case, a jury may allow against the defendant by way of punishment for wilfulness, wantonness, malice, or other like aggravation of his. wrong to the plaintiff, over and above full compensation for all injuries directly or indirectly resulting from such wrong." Syllabus Point 1, *O'Brien v. Snodgrass*, 123 W.Va. 483, 16 S.E.2d 621 (1941).

*State, ex rel. State Auto Ins. v. Risovich*, 204 W.Va. 87, 92–93, 511 S.E.2d 498, 503–504 (1998). Therefore, the insertion of punitive damages into W.Va.Code § 5–11–13(c), as being included in "other legal and equitable relief," plainly is not in accord with the purpose and text of that code section; it is inconsistent with this Court's previous statements; and it amounts to nothing more than judge-made law.

Finally, even if the Human Rights Act provided for punitive damages, such damages would not be appropriate under the facts of this case. According to our law:

> In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous.

Syllabus Point 4, *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895), *overruled in part on other grounds by Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991). In determining whether the appellant acted with the requisite state of mind to be liable for punitive damages, it is helpful to review the recent United States Supreme Court decision in *Kolstad v. American Dental Association*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). In *Kolstad*, the Supreme Court determined that to be liable for punitive damages under Title VII, one must show that the employer acted with malice or reckless indifference which "pertain to

the employer's knowledge that it may be acting in violation of federal law." *Kolstad*, at 2124. The Supreme Court concluded that "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* Applying this standard to the instant facts, no reasonable jury could conclude that the appellant knew that it may be acting in violation of the Human Rights Act by replacing the appellee. The appellant had in place a generous medical leave policy no doubt designed to accommodate the temporary disabilities of employees. The appellant replaced the appellee in accordance with the terms of this policy.

The majority, however, appears to justify the award of punitive damages by intimating that the appellee's supervisor, Dr. Abedi, persuaded management to replace the appellee because of his intolerance of the appellee and her high-risk pregnancy. Apparently the majority believes the appellant is vicariously liable for the state of mind of Dr. Abedi. This reasoning, however, is problematic. In *Kolstad*, the Supreme Court stated that "[t]he common law has long recognized that agency principles limit vicarious liability for punitive awards." *Kolstad*, at 2127. The Supreme Court further said:

> Holding employers liable for punitive damages when they engage in good faith efforts to comply with Title VII … is in some tension with the very principles underlying common law limitations on vicarious liability for punitive damages—that it is "improper ordinarily to award punitive damages against one who himself is personally innocent and therefore liable only vicariously." Restatement (Second) of Torts, supra, § 909, at 468, Comment b. Where an employer has undertaken such good faith efforts at Title VII compliance, it "demonstrat[es] that it never acted in reckless disregard of federally protected rights." [*Kolstad v. American Dental Ass'n*,] 139 F.3d, [958] at 974 [ (C.A.D.C. 1998) ] (Tatel, J., dissenting); see also *Harris [v. L & L Wings, Inc.]*, 132 F.3d, [978] at 983, 984 [ (4th Cir.1997) ] (observing that, "[i]n some cases, the existence of a written policy instituted in good faith has

operated as a total bar to employer liability for punitive damages[.]")

*Kolstad*, at 2128–29.

In this case, the appellant had a written policy designed to accommodate the temporary disabilities of employees. The appellant's action toward the appellee was based on the provisions of this policy. There is no evidence whatsoever that management replaced the appellee because of a reckless or malicious state of mind. Further, under *Kolstad*, it is improper to award punitive damages against the appellant based on Dr. Abedi's state of mind. This Court, therefore, should have reversed the award of punitive damages. Accordingly, for the reasons stated above, I respectfully dissent.

WORKMAN, Justice, concurring, in part, and dissenting, in part.

(Filed July 16, 1999)

Although I agree with the majority's conclusion that punitive damages may be awarded in a case brought pursuant to the West Virginia Human Rights Act ("Act"), West Virginia Code §§ 5–11–1 to –20 (1999), provided that such action is filed in circuit court, I do not believe that the facts of this case rise to the level of conduct that is historically required to permit an award of punitive damages. In addition, the previously unsettled aspect of whether an individual, whose disability is limited temporally and who is not capable of currently performing his/her job duties, qualifies as a disabled person under the Act bodes strongly against an award of punitive damages in this case. In other words, it is in my mind unfair to allow punitive damages to stand against an employer on the basis of a legal premise only now being enumerated.

As we explained in *Alkire v. First National Bank of Parsons*, 197 W.Va. 122, 475 S.E.2d 122 (1996), the following rule is still valid for determining whether punitive damages can be awarded:

> In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment

authorizes it, the jury may assess exemplary, punitive, or vindicative damages; these terms being synonymous.

*Id.* at 129, 475 S.E.2d at 129 (quoting Syl. Pt. 4, *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895)). Unlike the majority, I cannot reach the conclusion that the conduct at issue here—the termination of an employee pursuant to a company medical leave of absence policy which promised to only hold open jobs for individuals on medical leave for six months—amounts to the wanton, willful, or reckless indifference that is necessary to permit an award of punitive damages.

Under the reasoning employed by the majority, employers in this State could be prevented from ever applying comparable provisions of their medical leave policies and will be required to hold open positions until some unknown date in the future when it strikes the fancy of the disabled employee to contact his/her employer or to just show up for work, as the plaintiff did in this case. While the majority seemingly obliterates any responsibility on the plaintiff's part as far as notifying her employer when she might be returning to work, I think it only fair that, when considering punitives, the plaintiff's actions be viewed from the employer's vantage point also. The plaintiff in this case took very little action to keep her employer apprised of her situation. As to an actual date when she might return, the employer had only one communication as to plaintiff's return date and that was provided in a form completed in November 1996 by plaintiff's physician.

Furthermore, I believe the majority should have given greater consideration to the recent decision of the United States Supreme Court in *Kolstad v. American Dental Association*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), in which the Court set forth various limitations on the awards of punitive damages under Title VII actions. *See* 42 U.S.C. § 2000e et seq. (1984). One of those factors is whether the "underlying theory of discrimination ... [is] novel or otherwise poorly recognized." 527 U.S. at ——, 119 S.Ct. at 2125. Never before have individuals such as plaintiff been recognized as disabled and therefore entitled to the protections of the Act. Previously, to qualify as disabled under the Act, an individual had to have been currently capable of performing his/her job with a reasonable accommodation. In this case, there was no dispute that plaintiff could not perform her job with any accommodation. For the first time, this Court has interpreted the Act to define a reasonable accommodation to include a temporary leave of absence. Because the majority clearly alters previously-established standards for entitlement to protections under the Act, it is highly inequitable to charge an employer for willful, wanton disregard of this State's laws—when the very law that the employer is found to have willfully ignored previously did not even include the plaintiff under its definitions of a disabled person.