Charles B. HOOPS, et al., Plaintiffs,

v.

**ELK RUN COAL COMPANY, INC., Defendant.**

No. CIV. A. 2:99–0188.

United States District Court, S.D. West Virginia, Charleston Division.

April 28, 2000.

Roger D. Hunter, Neely and Hunter, Charleston, WV, for Plaintiffs.

Albert F. Sebok, Daniel L. Stickler, Erin Magee Condaras and W. Scott Evans, Jackson & Kelly, Charleston, WV, for Defendant.

### CORRECTED MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is Defendant Elk Run Coal Company, Incorporated's (Elk Run's) motion for summary judgment. The motion is **GRANTED** in part and **DENIED** in part.

## I. FACTUAL BACKGROUND

The Plaintiffs worked for Elk Run at various underground mining operations. All were current hourly employees in mid–1998, when the coal reserves at Elk Run's Twilight Winifrede (TW) Mine neared depletion. Elk Run analyzed its staffing needs at other mines and asserts it did not have a place for the TW employees once that mine closed. Elk Run evaluated all of its hourly employees to determine which to retain.

Plaintiffs assert the evaluation process was unfairly disadvantageous to older workers for a number of reasons. For example, Elk Run evaluated the employees based on four categories: (1) job skills (current job); (2) job skills (other jobs); (3) membership; and (4) Elk Run history. While Elk Run used longevity at the operation to break rating ties among the employees,[1] it was not a consideration otherwise. Elk Run's employee handbook, however, stated as follows:

**REDUCTION OF WORK FORCE**

In the event that mining conditions, economic considerations, loss of coal orders, or other events require, the work force may be realigned, reduced, or laid off. Should it become necessary to reduce or realign the workforce, *the Company will consider your longevity at the operation among other factors in determining who will be retained.*

---

1. Only one tie needed to be resolved.

(Dep. of John Vincent Brown II at ex. 1 (emphasis added)).[2] John Vincent Brown, formerly Manager of Human Resources of Elk Run, stated as follows regarding the intent of the provision:

> Q Now, when the handbook changed in 1995, what was—well, was there a change in the reduction of work force provisions?
>
> A As I understood it, no, sir. *It still should have been the skills, ability, and seniority. That was the premise of Massey's whole—if there was ever going to be a work force reduction, that's how it was supposed to have been done.*
>
> Q And just so we're clear, when we say seniority, is that term interchangeable with the term longevity, which I think may actually be used?
>
> A Yes, sir, it is. Longevity at the operation, uh-huh.

(Brown dep. at 12 (emphasis added)).[3]

Following the evaluation, Elk Run terminated twenty-nine of its underground hourly coal miners in a RIF announced and made effective on September 29, 1998. Twenty-two of those terminated were older than forty years of age, including nine Plaintiffs. Following their termination, Plaintiffs instituted this action, which was removed from the Circuit Court of Boone County. Plaintiffs alleged the following claims: (Count I—Disparate Treatment Age Discrimination); (Count II—Disparate Impact Age Discrimination); (Count III—Disability Discrimination); (Count IV—Disparate Impact Disability Discrimination); (Count V—Unjust Enrichment and Breach of Contract); (Count VI—Fraud and Negligent Misrepresentation); (Count VII—Intentional Infliction of Emotional Distress); (Count VIII—Race Discrimination); and (Count IX—Disparate Impact Race Discrimination).

In denying Plaintiffs' motion to remand, the Court held certain parts of Plaintiffs' complaint were completely preempted by section 510 of ERISA, 29 U.S.C. § 1140.[4] On September 21, 1999 Plaintiffs voluntarily dismissed Counts Five and Six. Elk Run's motion seeks dismissal of the remaining Counts.

## II. DISCUSSION

### A. The Summary Judgment Standard

Our Court of Appeals has often stated the settled standard and shifting burdens governing the disposition of a motion for summary judgment:

> Rule 56(c) requires that the district court enter judgment against a party who, "after adequate time for ... dis-

---

2. Elk Run officials conflict on discussions regarding the inclusion of an evaluation category for longevity. Frank Foster, Elk Run's Vice–President for operations, testified in an early Reduction in Force (RIF) planning meeting he "wondered if we should consider longevity as the only factor in the layoff procedure." (Dep. of Gary F. Foster at 207.) He said the subject occupied "several hours of deliberation[.]" *Id.* James Adkins, however, characterized the discussions on the longevity category as merely "a short debate." (Dep. of James L. Adkins at 48.) Also, contrary to the handbook, Adkins further stated "As far as seniority goes, it's always been one of the last considerations on anything at Elk Run ... and this was really no different." *Id.*

3. The provision in the employee handbook is, of course, not binding on Elk Run. Nevertheless, it could not discard the provision to advance a discriminatory motive.

4. Plaintiffs alleged throughout their complaint Elk Run had a pension- and benefit-defeating motive for terminating their employment. *See Hoops v. Elk Run Coal Co., Inc.,* 57 F.Supp.2d 357, 360 (S.D.W.Va.1999). Such claims fall squarely within the protection of ERISA section 510. Further, several courts have recognized section 510 claims are subject to complete preemption, an exception to the well-pleaded complaint rule. One of the most comprehensive recent discussions of the issue is found in *Wood v. Prudential Insurance Co. of America,* 207 F.3d 674 (3rd Cir.2000), a divided panel opinion. The Court believes the analysis in *Wood,* in addition to the analysis in the Court's Memorandum Opinion denying remand, demonstrates complete preemption is appropriate. The Court is thus vested with subject matter jurisdiction.

covery fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." To prevail on a motion for summary judgment, the [movant] must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law. In determining whether a genuine issue of material fact has been raised, we must construe all inferences in favor of the [the nonmovant]. If, however, "the evidence is so one-sided that one party must prevail as a matter of law," we must affirm the grant of summary judgment in that party's favor. The [nonmovant] "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." To survive [the motion], the [nonmovant] may not rest on [his] pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue. As the *Anderson* Court explained, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff[.]"

*Harleysville Mut. Ins. Co. v. Packer*, 60 F.3d 1116, 1119–20 (4th Cir.1995) (citations omitted); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir.), *cert. denied*, 513 U.S. 813, 115 S.Ct. 67, 68, 130 L.Ed.2d 24 (1994); *see also Cabro Foods, Inc. v. Wells Fargo Armored Serv. Corp.*, 962 F.Supp. 75, 77 (S.D.W.Va.1997); *Spradling v. Blackburn*, 919 F.Supp. 969, 974 (S.D.W.Va.1996).

"At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried. If not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly." *Thompson Everett, Inc. v. National Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir.1995).

**B.  Judicial Estoppel of Claims by Hoops and Maynor**

■ Two Plaintiffs, Hoops and Maynor, were awarded Social Security disability (SSDI) benefits retroactive to September 29, 1998 and September 28, 1998 respectively. Both were terminated by Elk Run on September 29, 1998. Elk Run asserts these awards now prevent both Plaintiffs from proving a prima facie case on their age and disability discrimination claims.

In *King v. Herbert J. Thomas Memorial Hospital*, 159 F.3d 192 (4th Cir.1998), King filed an age discrimination action against her former employer under the West Virginia Human Rights Act (WVHRA). The Court of Appeals held King was judicially estopped from asserting, as required for discrimination claims under the WVHRA, that she was able and competent to perform her previous work at the time of her discharge. The estoppel arose from her assertion to the Social Security Administration (SSA) after her firing that she became disabled from doing her job around the time of her discharge. She was awarded benefits retroactive to a week before her termination. The court, recognizing there is "only one truth about a given set of circumstances," *id.* at 196, stated as follows:

> To establish a claim for unlawful age discrimination under West Virginia law, a claimant must demonstrate, among other matters, that she "is able and competent to perform the services required" of her employment with or without accommodation.
>
> . . . .
>
> Upon these facts, we agree with the district court that King is judicially estopped from asserting, as required for her West Virginia age discrimination claim, that she was "able and competent" to perform her previous work at the hospital at the time of her discharge. To allow King to obtain benefits from two sources based on two incompatible positions, simply because the positions

aid her claims for remuneration, would reduce truth to a mere financial convenience and would undermine the integrity of the judicial process. In the factual circumstances of this case, we conclude that the district court was well within its discretion in applying judicial estoppel to preclude King from asserting a necessary element of her West Virginia age discrimination case.

*Id.* at 195–96, 198.

Plaintiffs assert two primary reasons *King* does not apply. First, they argue *King* dealt with a pre-termination onset date while Hoops and Maynor have post-termination onset dates. The assertion is factually misplaced. Hoops' onset date was the same date as his termination and Maynor's preceded his termination date by one day. Further, King's onset date occurred just one week prior to her termination.

Second, Plaintiffs assert *King* is displaced by *Haynes v. Rhone–Poulenc, Inc.,* 206 W.Va. 18, 521 S.E.2d 331 (1999). Plaintiffs appear to argue *Haynes* established a policy of having "discrimination

claims heard on the merits rather than to let the 'able and competent to work' idea give a discriminatory employer a technical defense with which to avoid the merits of a claim." (Resp. Br. at 25–26.) Plaintiffs extend *Haynes* well beyond its logical boundaries. *Haynes* did not deal with the issue raised in *King* and cannot fairly be read as otherwise eliminating from the WVHRA the able and competent language the Legislature purposely included. *King* remains good law, and this Court is bound to apply it.[5]

Accordingly, the Court **GRANTS** Defendant's motion for summary judgment on Hoops' and Maynor's age and disability discrimination claims.[6]

## C. COUNTS I AND II: Disparate Treatment and Disparate Impact Age Discrimination Claims

Plaintiffs Jerry Jarrell, Raymond T. Johns, Jimmy Higginbotham, Lawrence E. Long, Sr., Milton Mahan, Robert Walker and Thomas L. White assert they are victims of age discrimination. The Court concludes genuine issues of material fact

---

**5.** The Court makes its ruling with an awareness of *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). In *Cleveland,* the Supreme Court held (1) claims for SSDI benefits and ADA damages did not inherently conflict, and (2) employees are entitled to explain the discrepancy between statements of total disability made in pursuing SSDI benefits and statements to the contrary supporting their ADA claims. The Supreme Court, however, stated:

> Nonetheless, an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work. To survive a defendant's motion for summary judgment, *she must explain why that SSDI contention is consistent with her ADA claim that she could "perform the essential functions" of her previous job, at least with "reasonable accommodation."*

*Id.* at 798, 119 S.Ct. 1597 (emphasis added). Hoops and Maynor have attempted no such explanation here. In fact, both have agreed with defense counsel they are totally disabled from working in the mines. (Dep. of Charles B. Hoops, Jr. at 77); (dep. of Harvey B. Maynor at 25–26.)

**6.** The key facts in *King* are analogous to the instant case. First, King asserted to SSA (1) she was physically unable to do her previous job as a dietary aide; and (2) she became disabled around the time of her discharge. While the deposition testimony is equivocal at times, Hoops and Maynor presumably asserted likewise. They in fact concur with SSA's conclusion they became permanently and totally disabled either on or before their termination dates. Second, SSA necessarily determined King was "unable to do her previous work." A similar finding would have been necessary by statute in Hoops' and Maynor's SSDI cases. Third, like Hoops and Maynor, King benefitted herself by obtaining the SSA award. Fourth, King continued to assert under oath she was disabled and continued to receive disability benefits. These same facts are present in the instant case.

Only if Hoops and Maynor can yet present the Court with proof they did not assert to SSA they were physically unable to do their previous jobs at or around the time of their discharge will the Court reconsider its determination.

remain extant on Plaintiffs' disparate treatment and disparate impact age discrimination claims. Accordingly, Elk Run's motion for summary judgment on these claims is **DENIED.**

### D. COUNT III: Disparate Treatment Disability Discrimination Claims

The Supreme Court of Appeals of West Virginia revisited recently the WVHRA framework for disability discrimination claims:

> The West Virginia Human Rights Act provides that "[i]t shall be an unlawful discriminatory practice ... [f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required even if such individual is ... [disabled] [.]" W. Va.Code, 5–11–9(1) [1992] (emphasis added). When determining whether an employer has unlawfully discriminated against a [disabled] employee, the employee must first establish a prima facie case of [disability] discrimination.
>
> In order to establish a case of discriminatory discharge under W. Va.Code, 5–11–9 [1989], with regard to employment because of a [disability], the complainant must prove as a prima facie case that (1) he or she meets the definition of '[disabled],' (2) he or she is a 'qualified [disabled] person,' and (3) he or she was discharged from his or her job.

*Hosaflook v. Consolidation Coal Co.*, 201 W.Va. 325, 329–30, 497 S.E.2d 174, 178–79 (1997). One is disabled under the WVHRA when he has:

> (1) A mental or physical impairment *which substantially limits one or more of such person's major life activities.* The term "major life activities" includes functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working;
>
> (2) A record of such impairment; or
>
> (3) Being regarded as having such an impairment

W. Va.Code § 5–11–3(m) (emphasis added).[7] Once plaintiff establishes a prima facie case of disability discrimination:

> [t]he burden of production then shifts to the employer to come forward with a legitimate, nondiscriminatory reason for its actions. In the unlikely event that the employer at this juncture remains silent, the unrebutted presumption compels the court to enter judgment for the plaintiff. But once the employer meets this burden of production, the presumption raised by the prima facie case is rebutted, and the "inquiry proceeds to a new level of specificity." The *Barefoot/McDonnell Douglas* framework and

---

7. The *Rules Regarding Discrimination Against Individuals with Disabilities* promulgated by the West Virginia Human Rights Commission offer further, helpful definitions. A "physical impairment":

> means any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory; speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine.

77 C.S.R. § 1.2.2 (1994). The phrase "Physical or Mental Impairment":

> includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, and emotional illness.

*Id.* § 1.2.4. "Substantially limits" means:

> The inability to perform a major life activity that the average person in the general population can perform;
>
> A significant restriction as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major activity; but
>
> Substantially limits does not include or mean minor temporary ailments or injuries. Examples of minor temporary ailments are colds or flu, or sprains or minor injuries.

*Id.* § 2.5

its attendant burdens and presumption cease to be relevant at that point, and the onus is once again on the employee to prove that the proffered legitimate reason is a mere pretext rather than the true reason for the challenged employment action. While *Barefoot/McDonnell Douglas* allows the employee to shift the burden of production to the employer by establishing a prima facie case, at all times the burden of proof or the risk of nonpersuasion on the issue of whether the employer intended to discriminate remains on the plaintiff.

*Skaggs v. Elk Run Coal Co., Inc.,* 198 W.Va. 51, 71, 479 S.E.2d 561, 581 (1996).

Elk Run's memorandum in support discusses the physical limitations alleged by the Plaintiffs who claim disparate treatment disability discrimination. Plaintiffs concede "[a]s to the individual disabilities alleged, Defendant's memorandum accurately lists the physical claims that are alleged to be the basis for protected disability in this case." (Resp. Br. at 23.) Accordingly, the Court essentially passes on a stipulated set of facts on this issue, supplemented with some additional facts gleaned from its independent review of the Plaintiffs' depositions and other materials of record.

### 1. Jarrell and Wood

■ Jarrell asserts he was terminated because of his disabilities, a 1997 heart attack, a 1994 foot injury, and a 1993 hand injury. At the same time, he states none of those conditions prevented or limited him from doing his job or from engaging in any other activity. He cannot show a substantial limitation on any major life activi-

ty, nor a perception of such, and thus no protected disability.

■ Wood complains of injuries he received in a car accident.[8] The accident occurred one week prior to the RIF. It resulted in eleven stitches, some bruising and a scar. He walked away from the accident and called the police. His stitches were removed approximately a week later. Temporary conditions such as this are excluded from the protections of the WVHRA.[9] *See supra* n. 7. Accordingly, the Court **GRANTS** Elk Run's motion as to Jarrell and Wood.

### 2. Walker

■ Another Plaintiff makes a stronger showing of disability, but ultimately cannot survive summary judgment for other reasons. After reviewing the parties' submissions, Walker fails to establish the necessary link between Elk Run's termination decision and his status as a member of the protected class. Elk Run's actions with respect to Walker do not give rise to an inference that the decision was based on an illegal discriminatory criterion. Accordingly, Elk Run's motion for summary judgment is **GRANTED** as to Walker's disparate treatment disability discrimination claim.

### 3. Johns, Long, Mahan, and Worley

The Court concludes genuine issues of material fact remain extant as to Johns', Long's, Mahan's, and Worley's claims for disparate treatment disability discrimination. Accordingly, Elk Run's motion is **DENIED** as to these Plaintiffs' claims.

---

8. Wood also mentioned a lung condition and a back and knee problem in his deposition. The parties have not illuminated this issue, nor provided the Court with details in the deposition excerpts. In any event, Wood testified (1) the lung condition did not interfere with his ability to work or to perform any activities outside work; and (2) Elk Run officials were not aware of his back problems.

9. Wood asserts Jim Walker, an Elk Run supervisor who participated in the evaluation process, told him to go home when he came to work two days after the accident. Walker also told Wood he had an excellent rating and his job would be waiting for him when he returned. When Wood returned a week later, however, he was terminated.

## E. COUNT IV: Disparate Impact Disability Discrimination Claims

In their response memorandum, Plaintiffs assert:

> Elk Run based its termination decisions ... on impermissible consideration of workers' *physical conditions* and handicaps or disabilities *and their health and injury conditions and histories* in violation of the WVHRA.... Using the demographic data *concerning physical problems and injuries for Defendant's underground work force* ... and information as to which Plaintiffs claimed disability discrimination in their depositions, Plaintiffs' statistical expert Dr. Dennis P. Brady performed statistical studies bearing on the issue of *physical condition* and disability discrimination.

Resp. mem. at 19–20 (emphasis added).[10]

■ The underscored portions of the excerpt call into question the relevance of the disability portion of Dr. Brady's analysis. Simply put, it is not an employee's "physical condition[,]" "health and injury conditions and histories[,]" or "physical problems and injuries" that invoke protection under the WVHRA. Rather, the proper population is those individuals who reside in the protected class, namely those with disabilities as defined by *West Virginia Code* section 5–11–3(m). *See Skaggs v. Elk Run Coal Co., Inc.,* 198 W.Va. 51, 63, 479 S.E.2d 561, 573 (1996)("The disparate impact model bars an employer from relying on employment criteria that *disproportionately affect a protected class* but which are not job related.")(emphasis added); *West Virginia Univ./West Virginia Bd. of Regents v. Decker,* 191 W.Va. 567, 568, 447 S.E.2d 259, 260 (1994)("In proving a prima facie case of disparate impact ... the plaintiff bears the burden of (1) demonstrating that the employer uses a particular employment practice or policy and (2) establishing that such particular employment practice or policy causes a disparate impact *on a class protected by the Human Rights Act.*")(emphasis added).[11]

Dr. Brady expanded part of his study population well beyond those individuals with legal disabilities as defined by the WVHRA. Thus, he has not analyzed appropriately the question of whether individuals who are legally disabled suffered disparately by the RIF decision. By including in his analysis individuals who merely experienced injuries or unspecified physical conditions, his results are necessarily overstated. Accordingly, absent other statistical evidence, Elk Run is entitled to judgment as a matter of law on this claim. The Court **GRANTS** this portion of Elk Run's motion.

## F. COUNT VII: Intentional Infliction of Emotional Distress

The Supreme Court of Appeals of West Virginia recently discussed the proof required to demonstrate the tort of outrage in the employment context:

> In *Dzinglski v. Weirton Steel Corp.,* 191 W.Va. 278, 445 S.E.2d 219 (1994), we discussed the manner of distinguishing a wrongful discharge claim from a claim for the outrageous or reckless infliction of emotional distress, when both causes of action arise from the manner in which the plaintiff was discharged from employment. We stated in Syllabus Point 2:
>
> > The prevailing rule in distinguishing a wrongful discharge claim from an outrage claim is this: when the employ-

---

10. Dr. Brady's report discloses his "statistical test was based on ... demographic data concerning *MSHA-reportable and lost-time accidents and other physical problems,* from 1996 through 1998[,]" Brady aff. ¶ 34 (emphasis added). It was further based on Plaintiffs who claimed in deposition that physical problems and or injuries were the basis for their terminations. The Court has dismissed the majority of the disparate treatment disability claims *supra.* Undoubtedly, this dismissal adversely impacts Dr. Brady's calculations in favor of Plaintiffs.

11. Plaintiffs acknowledge as much in the proposed, integrated pretrial order. *See* Proposed Integrated Pretrial Order at 13.

ee's distress results from the fact of his discharge—*e.g.*, the embarrassment and financial loss stemming from the plaintiff's firing—rather than from any improper conduct on the part of the employer in effecting the discharge, then no claim for intentional infliction of emotional distress can attach. When, however, the employee's distress results from the outrageous manner by which the employer effected the discharge, the employee may recover under the tort of outrage. In other words, the wrongful discharge action depends solely on the validity of the employer's motivation or reason for the discharge. *Therefore, any other conduct that surrounds the dismissal must be weighed to determine whether the employer's manner of effecting the discharge was outrageous.*

*Travis v. Alcon Labs., Inc.,* 202 W.Va. 369, 504 S.E.2d 419, (1998). With respect to outrageous conduct, this Court has observed:

> Plaintiff has a difficult burden. The comments to Restatement of Torts (Second) § 46 explain:
>
>> Liability has been found only where the conduct has been *so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.* Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous."

*Burgess v. Gateway Communications, Inc.,* 26 F.Supp.2d 888, 893–94 (S.D.W.Va.1998)(emphasis added).

█ In their one paragraph response to Elk Run's request for dismissal of the tort-of-outrage claim, Plaintiffs assert "there is enough serious evidence of serious intentionality and a reckless, cavalier attitude toward these men, that at least a jury

ought to be allowed to hear and evaluate all of this evidence and determine if [sic] weight." (Resp. Br. at 30.) This summary assertion is insufficient to defeat judgment as a matter of law. After reviewing the deposition testimony of Plaintiffs regarding the manner in which they was discharged, and assuming they could demonstrate severe emotional distress, the Court yet cannot identify a basis upon which to conclude Elk Run acted outrageously in effecting their discharge. Accordingly, the Court **GRANTS** Elk Run's motion for summary judgment on this claim.

## G.   COUNTS VIII AND IX: Race Discrimination Claims

Mahan is an African–American, and his disparate treatment claim is based on his termination. The claims are governed by the previously discussed three-step *Barefoot/McDonnell Douglas* evidentiary framework. In *Henderson v. Columbia Natural Resources,* 45 F.Supp.2d 532, 535–36 (S.D.W.Va.1999), *aff'd,* No. 99–2123, 2000 WL 389683 (4th Cir. Apr. 18, 2000), the Court discussed the critical first step in that framework, namely a plaintiff's obligation to demonstrate a prima facie case:

> To state a prima facie case of employment discrimination, the plaintiff must prove: "(1) That the plaintiff is a member of a protected class; (2) That the employer made an adverse decision concerning the plaintiff; (3) But for the plaintiff's protected status, the adverse decision would not have been made." "The 'but for' test of discriminatory motive in *Conaway* ... is merely a threshold inquiry, requiring only that a plaintiff show an inference of discrimination." *"What is required of the plaintiff is to show some evidence which would sufficiently link the employer's decision and the plaintiff's status as a member of a protected class so as to give rise to an inference that the employment decision was based on an illegal discriminatory criterion."*

*[T]he law is clear that the basic inquiry in discrimination cases is whether the facts give rise to a reasonable inference of discrimination.*

*Id.* at 535–36.

Mahan alleges he was frequently called "black ass" and "buckwheat." When asked who referred to him by those labels, he stated:

> Just different people. I don't know all these guys' names. You know, they do it so much, you just forget about some of it, you know. Some of it goes in one ear and out the other ear.

(Dep. of Milton E. Mahan at 53.) When asked specifically about the involvement of supervisory employees in this misconduct, he stated:

> [Mr. Terry] . . . was always telling me to get my black ass, whatever, you know. You know, he'd tell me, "Get your black ass over there," or he will do something to my black ass, or whatever. ·
>
> Q How often did he say that to you?
>
> A Not too often. When he was around some guys or something like that he might, you know, come up. I know about at least three times, you know.
>
> . . . .
>
> Q Those statements that he made, were those back, say, during your first three years of employment that he would have made those statements?
>
> A Yeah.

. . . .

Q Do you remember any management employees around when any of the hourly employees used the term "buckwheat"?

A They might have been in the offices or whatever. Like I say, you come in there, you hear this and see this so much you just try not—you know, it goes in one ear and out the other. You go and do what you've got to do.

. . . .

Q Do you remember any supervisory employees being around when an hourly employee used the term "black ass"?

A No.

*Id.* at 54–57. Based on Mahan's hire date, Terry would have made the alleged comments no later than 1995, three years before the termination. Further, Terry had no role in the evaluation process.

■ The remarks are deplorable and objectionable in any context. Nonetheless, they fail to establish the necessary link between Elk Run's employment decisions and Mahan's status as a member of the protected class so as to give rise to an inference the employment decision was based on race. Accordingly, the Court **GRANTS** Elk Run summary judgment on this claim.[12] The Court further **GRANTS** Elk Run summary judgment on the disparate impact race claim for the reasons stated in the margin.[13]

---

**12.** The Court observes its dismissal of this claim and certain individual disability discrimination claims is appropriate under either a traditional disparate treatment model or one based upon the more generous mixed-motive standard.

**13.** The analysis of the disparate impact claim is straightforward. Two of Elk Run's five African–American employees were terminated in the RIF. Dr. Brady states as follows:

> [T]he layoff rate of African–American employees is compared to non African–American workers. The layoff rate of African–Americans is 40.00% (2 of 5), the layoff rate among non-African-American workers is 11.334%. The [number of standard deviations] is +1.95, the probability is 0.109, and

the odds are 1 in 9.13. *This analysis indicates that layoffs are in the direction of bias towards African–American workers. Forty percent (40%) of African–Americans in the work force were terminated, which in comparative terms is over three and a half (3½) times the layoff rate for non-blacks.*

Given the small number of African–Americans in the workforce this result is not statistically significant. If, however, there were 10 African–Americans instead of 5 in the workforce with the same layoff rate of 40.00%, the results would be statistically significant (probability = 0.0208, NSDS = +2.79).

Aff. in Chief of Dr. Dennis P. Brady ¶¶ 48–49 (bold in original, underscore added). Dr.

## H. Section 510 Claims

Plaintiffs continue to disavow any section 510 claims, or at most, simply rely on their evidence of age discrimination to support the claim. (*See* Resp. Br. at 19 n. 14.) ("Plaintiffs pled only West Virginia law claims and nowhere mentioned ERISA claims .... No ERISA issues are analyzed

herein."). To the extent the claims are not abandoned, the Court concludes Plaintiffs have failed to raise a genuine issue of material fact.[14] Accordingly, the Court **GRANTS** Elk Run summary judgment on the section 510 claims.

Given this dismissal, the Court must determine whether to retain supplemental

---

Brady's hypothetical, of course, is inappropriate. More importantly, however, there is little to suggest Elk Run employed a particular employment practice or policy that disparately impacted members of the African–American race. Based on this and other factors, the Court concludes Plaintiffs have not met their burden on this claim.

The Court grants this portion of Elk Run's motion with an appreciation of the rather relaxed statistical standards enunciated in *Dobson v. Eastern Associated Coal Corp.*, 188 W.Va. 17, 422 S.E.2d 494 (1992):

> [O]ur case law has allowed the use of statistical evidence to prove discrimination in employment. We decline the appellant's invitation to require that a specific method of statistical analysis be employed in cases involving certain types of employment termination because we believe that this would unduly burden plaintiffs in exercising their rights under the Human Rights Act.

*Id.* at 22–23, 422 S.E.2d at 499–500. The excerpt from *Dobson* has engendered significant disagreement between the parties. A further observation about its applicability at trial to the disparate impact age claims is warranted.

Elk Run's statistical expert, Dr. David W. Petersen, finds technical and substantive fault with many parts of Dr. Brady's analysis. Dr. Brady likewise faults Dr. Petersen with numerous errors. For example, Dr. Petersen challenges Dr. Brady's use of a one-tail, as opposed to a two-tail, test. Some, including our Court of Appeals, suggest a one-tail test favors a plaintiff's point of view and might be inappropriate under some circumstances. Elk Run asserts *Rule* 702, *Federal Rules of Evidence,* should control the type of statistical proof admissible at trial. *Rule* 702 certainly does have application to the experts' conclusions in this case. The application of that Rule, however, and its interpretations in *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) and *Daubert v. Merrell Dow Pharm. Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), are focused on general questions of reliability and relevance. Elk Run does not appear to suggest the one-tail test is unreliable or unacceptable from a general statistical point of

view. Rather, it simply suggests the test and other portions of Dr. Brady's analysis are insufficient as a means of proving disparate impact claims under the WVHRA. Elk Run's objection and reliance on *Rule* 702, however, go beyond the procedural, evidentiary realm.

The question of sufficiency of proof under West Virginia's anti-discrimination statute was discussed in *Dobson* and is at its essence a substantive principle of state law and public policy. While *Dobson* itself discussed *Rule* 702, *West Virginia Rules of Evidence,* it ultimately concluded a strict statistical scheme would "unduly burden plaintiffs in exercising their rights under the Human Rights Act." *Dobson* thus allows plaintiffs a considerable amount of leeway in the use of statistics to prove disparate impact under the WVHRA, as controlled, of course, by *Daubert/Kumho.* The Court respects that public policy interpretation. If there is otherwise a valid *Daubert/Kumho* issue present beyond these expressed limits, the Court will address it if and when timely presented.

**14.** In *Conkwright v. Westinghouse Electric Corp.,* 933 F.2d 231, 239 (4th Cir.1991), the Court of Appeals observed "other courts considering § 510 claims have borrowed the Title VII, McDonnell Douglas scheme of proof for the purpose of proof." Doing so here is fatal to Plaintiffs' claims, because they have made no showing of pretext.

Plaintiffs have not challenged Elk Run's assertion "only Mr. Hoops, Mr. Higginbotham, and Mr. Worley testified that they believed that health care costs or pension benefits motivated their terminations." Def.'s Br. in Supp. at 21. These Plaintiffs' allegations of a section 510 violation, however, are grounded merely in the speculation Elk Run would have saved money on its health and pension obligations by firing them. This is insufficient to prevail on a section 510 claim. *See id.* ("It is obvious that benefit costs make up a large amount of the costs of an employee to a company, and that pension rights are a substantial component of benefit costs, but these undeniable propositions are not sufficient standing alone to prove the requisite intent by the path of pretext.").

jurisdiction over the state claims. After considering the applicable factors, and the parties' *mutual* desire to bring the case to judgment in this forum, the Court retains supplemental jurisdiction. *See Shanaghan v. Cahill,* 58 F.3d 106, 109 (4th Cir. 1995)("the doctrine of supplemental jurisdiction [contained in § 1367] indicates that federal courts generally have discretion to retain or dismiss state law claims when the federal basis for an action drops away.").

## III. CONCLUSION

Based on the foregoing, the Court **GRANTS** in part and **DENIES** in part Elk Run's motion for summary judgment. The case will proceed to trial on the remaining claims.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record.